## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>84 GEORGE LLC,<br><br>        Debtor. | Case No. 10-44253-ESS<br><br>Chapter 11<br><br>**Hearing Date: May 2, 2011** |

### OBJECTION OF U.S. BANK, N.A., AS TRUSTEE,
### TO THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

TO:   HON. ELIZABETH S. STONG, U.S.B.J.
       UNITED STATES BANKRUPTCY COURT, EASTERN DISTRICT OF NEW YORK

U.S. Bank, N.A., as Trustee for the Registered Holders of Countrywide Commercial Mortgage Trust 2007-MF1, Commercial Mortgage Pass-Through Certificates, Series 2007-MF1 (the "Lender"), by and through its attorneys, McCarter & English, LLP, hereby objects to the Debtor's Second Amended Chapter 11 Plan dated February 11, 2011 (Docket No. 68, the "Plan"), and in support of its Objection, states:

### PRELIMINARY STATEMENT

1.    The Debtor is a single-asset Debtor owning and operating a six-unit apartment building located at 84 George Street in Brooklyn, New York (the "Property"). In connection with a Loan to the Debtor in the original principal amount of $750,000 (the "Loan"), the Lender holds a first Mortgage on the Property and an Assignment of Rents for the rental income of the Property (the "Rents"). Pre-petition, the Lender obtained a Judgment of Foreclosure and Sale (the "Judgment") in the United States District Court for the Eastern District of New York.

2.    The Debtor could have filed its plan on day one. Instead, the Debtor took more than five months to file a plan, which was then amended several months later (the "First

Amended Plan"). The First Amended Plan provided for a "cure" of the defaults under §1124 of the Bankruptcy Code. At a hearing in January, 2011, following legal arguments made by the Lender that the First Amended Plan was made in blatant disregard of established law and the Bankruptcy Code, the Debtor advised the Court it would amend the plan.

3.     The Debtor amended the Plan to provide for a "cram-down" under §1129(b), and it appears the Debtor is no longer attempting a "cure." Although the legal structure of the Plan has changed, the Lender's comments in its Objection to the First Amended Plan regarding the Debtor's lack of preparedness for confirmation remain applicable.

4.     In its Objection to the First Amended Plan, the Lender asserted that the Debtor was "woefully unprepared to proceed to confirmation." Docket No. 66, ¶4. In light of the Debtor's unwillingness to truly seek to proceed to a confirmation hearing, the Lender filed a Motion to Dismiss on February 24, 2011. Docket No. 78. Even still, the Debtor continues to be woefully unprepared to proceed to confirmation. The Debtor has asserted in its original Petition that the value of the real property is $750,000. It is unclear at the moment if the Debtor continues to utilize that number for valuation, or if it presently takes the position that a different value applies. If the latter, at the hearing on confirmation, the Debtor will need to present evidence regarding the value of the Debtor's real property. If, at the confirmation hearing, the Debtor suggests a different value than what was sworn to in the Petition, this is further evidence of the Debtor's intentions to delay this case. In addition, the Debtor will need to present expert testimony regarding market rates of interest in order to attempt a "cram-down" under §1129(b). No applications have been filed by the Debtor to retain experts. It thus appears that the Debtor is unprepared to put forth evidence that would be necessary to confirm its Plan.

ME1 11518034v.1

5. Apart from the Debtor's apparent lack of preparedness, which, nearly a year into the case, is inexcusable, the Plan is legally deficient. The Debtor's members propose to retain their equity interests in violation of the Absolute Priority Rule. In addition, the Debtor seeks to use the Rents to reorganize, but the Rents are not property of the estate and may not be used by the Debtor to fund the Plan. For these and other reasons set forth below, the Plan fails to satisfy the requirements of the Bankruptcy Code.

6. This single-asset case has been ongoing for nearly a year. The Debtor has had adequate time to prepare for the hearing on confirmation and to present a legally sufficient plan. Its failure to do so is reflective of its inability to propose a confirmable plan.

## FACTUAL BACKGROUND - THE LOAN AND THE FORECLOSURE JUDGMENT

7. The Lender is the present holder of, among other things, a Note executed by the Debtor for repayment of the principal sum of $750,000 and a Mortgage and Assignment of Rents for the Property. See Attachment to Proof of Claim of U.S. Bank, N.A., as Trustee (Claims Register, Claim No. 2-1, the "Attachment to Proof of Claim"), ¶¶5-7. (The Note, Mortgage, Assignment of Rents and all other documents executed in connection therewith shall be referred to collectively as the "Loan Documents.")

8. The Debtor defaulted under the Loan Documents by virtue of, among other things, its failure to make timely monthly payments due under the Loan Documents since at least July 8, 2009 (collectively, the "Defaults").

9. Pre-petition, the Lender commenced a foreclosure action against the Debtor in the United States District Court for the Eastern District of New York, entitled U.S. Bank, N.A., as Trustee, etc. v. 84 George, LLC, et al., Civil Action No. 1:09-cv-04553-JBW, wherein the Honorable Jack B. Weinstein, U.S.D.J., entered a Judgment of Foreclosure and Sale in favor of the Lender and against the Debtor in the amount of $822,483.70. Id. at ¶4.

-3-

## PROCEDURAL HISTORY

10.     The Debtor filed a Petition for relief under Chapter 11 of the Bankruptcy Code on May 10, 2010.

11.     The Lender filed a claim in the amount of $841,224.05 (Claims Register, Claim No. 2-1, the "Claim"), which consists of the Judgment amount and post-judgment interest and fees.

12.     The Debtor has objected to certain amounts set forth in the Claim, however, the Claim has been temporarily allowed in full for purposes of voting on the Plan. Docket No. 76.

13.     The Debtor filed the Plan on February 11, 2011, and the Lender has cast ballots rejecting the Plan.

14.     The Lender filed a Motion to Dismiss on February 24, 2011.

## THE LENDER'S CLAIM

15.     The Lender's Claim is in the amount of $841,224.05. The Claim consists of the following amounts:

| | | |
|---|---|---|
| The stated amount of the Judgment ............. $ | | 822,483.77 |
| Interest at the rate of $232.82 per diem from January 16, 2010, through and including May 9, 2010 (114 days) ............... $ | | 26,541.48 |
| Additional attorneys' fees and costs incurred from January 7, 2010, through the petition date and not included in the Judgment ..................................................... $ | | 22,443.45 |
| Less credit for payments received................ $ | | (30,244.65) |
| **TOTAL**...................................................... $ | | 841,224.05 |

See Attachment to Proof of Claim, ¶11.

-4-

## ALLOWABILITY OF THE LENDER'S CLAIM

16.     The Claim is prima facie evidence of its validity and amount. See Fed. R. Bankr. P. 3001(f).  To overcome this prima facie evidence, the Debtor bears the burden of coming forward with sufficient evidence in rebuttal.  In re Reilly, 245 B.R. 768, 773 (2d Cir. 2000).  In addition to the prima facie validity of the Claim, substantially all of the amounts set forth in the Lender's Claim have been determined due and owing under the Loan Documents by the Final Judgment of a Federal District Court Judge, and the Debtor is barred from re-litigating the validity of such amounts.

17.     While the Debtor continues to assert that the Lender's Claim is in the amount of only $735,000 (see Second Amended Disclosure Statement, Docket No. 69, ¶22), Judge Weinstein determined in the pre-petition foreclosure action that the Lender was entitled to Judgment in the amount of $822,483.70 (see Attachment to Proof of Claim, ¶4, Exhibit A).  As set forth more fully in the Objection of U.S. Bank, N.A., as Trustee, to the Debtor's Motion to Estimate Secured Lender's Claim and Grant Further Related Relief (Docket No. 65, ¶¶13-15), under the doctrine of res judicata the Debtor is barred from re-litigating this determination.  See Saud v. Bank of New York, 929 F.2d 916, 919 (2d Cir. 1991) (quoting Morris v. Jones, 329 U.S. 545, 550-51 (1947)) ("'A judgment of a court having jurisdiction of the parties and of the subject matter operates as res judicata, in the absence of fraud or collusion, even if obtained upon a default.'").  The Debtor has failed to cite any law that would allow it to disregard the legal effect of the Judgment.  Thus, the Lender's Claim in the amount of $841,224.05 is prima facie valid, and the Debtor is barred from re-litigating the validity of the amounts that were determined due and owing under the Judgment.

ME1 11518034v.1

## CLASSES UNDER THE PLAN

18.    The Plan provides for three classes, as follows: Class 1 consists of the Lender's allowed secured Claim; Class 2 consists of all allowed unsecured claims, including any unsecured claim the Lender may have; and Class 3 consists of the equity interest of the Debtor, held by Menachem Stark and Israel Perlmutter.

## TREATMENT OF THE LENDER'S CLAIM

19.    Under §506(a) of the Bankruptcy Code, the Lender's Claim is treated as a secured claim to the extent of the value of the Property and the Rents, and the balance is treated as an unsecured claim.    The Debtor has estimated that the value of the Property is approximately $750,000.    See Affidavit Pursuant to Local Rule 1007 (Docket No. 6; the "Local Rule 1007 Affidavit"), Exhibit A.

20.    Section 506 does not address the date as of which the Property and Rents should be valued.    The general rule, supplied by the case law, is that in a Chapter 11 case the "value should be determined in close proximity to the effective date of the plan."    In re Melgar Enterprises, Inc., 151 B.R. 34, 39 (Bankr. E.D.N.Y. 1993); see In re Rodriguez, 272 B.R. 54, 56 (D. Conn. 2002) ("the final value of the creditor's secured claim is determined by the value of the debtor's property at the date of plan confirmation"); see generally In re Stanley, 185 B.R. 417, 425 (Bankr. D. Conn. 1995) ("The majority of courts . . . have held that for purposes of plan confirmation, collateral should be valued at or near the plan's confirmation or effective date." (collecting cases)).

21.    The Lender does not contest the Debtor's valuation of the Property at $750,000. However, since the Debtor has not definitively, for purposes of confirmation, set forth its value, the ballots filed on behalf of the Lender rejecting the Plan have a range as to the amounts of the Lender's Class 1 and Class 2 claims.

-6-

22.     Separate from the valuation of the Debtor's real property, the Lender is entitled to its interest in the Rents. The functional equivalence of that is payment of the Rents to the Lender, which is a separate source of repayment for the indebtedness.

## THE LENDER'S OBJECTIONS TO THE PLAN

**I.    THE PLAN IS NOT CONFIRMABLE UNDER §1129(A)(8) OF THE BANKRUPTCY CODE OR THE ALTERNATIVE "CRAM DOWN" PROVISIONS OF §1129(B)**

23.     As an initial matter, to confirm the Plan the Debtor most prove that it meets the requirements of §1129(a) of the Bankruptcy Code. See In re T.A.T. Prop., 2009 Bankr. LEXIS 739 (Bankr. S.D.N.Y. Feb. 20, 2009) ("[t]he debtor, as the proponent of the Plan, bears the burden of proof . . . by a preponderance of the evidence").

24.     In order to confirm the Plan, the Debtor must satisfy §1129(a)(8) of the Bankruptcy Code or the alternative "cram down" provisions of §1129(b). Section 1129(a)(8) provides that a plan is confirmable if each class has either accepted the plan or is not impaired under the plan. Here, the Plan alters the contractual rights of the Lender, and thus the Lender is "impaired" under the Plan within the meaning of §1124 of the Bankruptcy Code; this is acknowledged by the Debtor. Plan, p. 6, §3.4. The Lender has rejected the Plan, and thus the Debtor does not satisfy the stated requirements of §1129(a)(8).

25.     As an alternative means of satisfying §1129(a)(8), the Debtor appears to rely on the "cram down" provisions of §1129(b). To satisfy §1129(b), the Debtor must prove, among other things, that the "plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).

26.     With respect to a secured claim, "fair and equitable" treatment requires that the secured lender (a) retain the pre-petition liens securing its claim and (b) receive deferred cash

-7-

payments equal to the present value of its allowed claim under the Plan. 11 U.S.C. § 1129(b)(2)(A)(i).

27.　　"[A] creditor receives the 'present value' of its claim only if the total amount of the deferred payments includes the amount of the underlying claim plus an appropriate amount of interest to compensate the creditor for the decreased value of the claim caused by the delayed payments." In re 20 Bayard Views, LLC, 2011 Bankr. LEXIS 723, *52 (Bankr. E.D.N.Y. Mar. 7, 2011) (attached) (quoting Rake v. Wade, 508 U.S. 464, 472 n.8 (1993)). In determining whether the interest rate proposed under the plan is sufficient, Courts first look to whether the proposed rate is equal to the market rate of interest for a loan "similar in term, quality of security, and risk of repayment or financial condition of the borrower." Id. at *63 (quoting In re One Times Square Assocs. Ltd. P'ship, 159 B.R. 695, 706 (Bankr. S.D.N.Y. 1993)). In the absence of an efficient market for the loan proposed in the plan, however, the Court instead uses the "prime-plus" or "formula rate" approach described in Till v. SCS Credit Corp., 541 U.S. 465 (2004). The "formula approach uses the national prime rate . . . and adds an appropriate risk adjustment. . . . factors such as 'the circumstances of the estate, the nature of the security and the duration and feasibility of the reorganization plan' are considerations in determining the size of the risk adjustment." Id. at *56 (quoting 541 U.S. at 479).

28.　　Here, in order to prove that any "cram-down" plan would pay to the Lender the present value of its allowed secured claim, the Debtor must prove that (a) the proposed interest rate of 4.75% is equal to or greater than the market rate of interest for a loan "similar in term, quality of security, and risk of repayment or financial condition of the [Debtor]" (id. at *63); or (b) that there is no efficient market for the loan proposed under the Plan, and that the proposed

-8-

interest rate is equal to or greater than the rate determined under the "formula rate" approach set forth in Till.

29.     Importantly, the principal amount of any such "cram-down" loan would be, by definition, equal to the amount of the Property. The Debtor would be obtaining 100% financing in the "cram-down" scenario, and thus the Court would need to consider the rate of interest that the market would charge (or, under the "formula approach," the appropriate risk adjustment) to this particular Debtor for 100% financing for the Property. Furthermore, in considering the rate of interest that would be available to the Debtor in the marketplace, the Court should take into account the unique credit risks of the Debtor (i.e., its repeated defaults under the Loan Documents, and the multiple bounced checks during the bankruptcy proceeding). The Debtor will be unable to prove that the interest rate of 4.75% provided for under the Plan satisfies §1129(b) of the Bankruptcy Code. Thus, the Debtor will be unable to satisfy §1129(b) with respect to the Lender's secured claim.

30.     With respect to the Lender's unsecured claim, if any, "fair and equitable" treatment requires that the Lender receive property equal to the allowed amount of such claim, failing which the Plan must satisfy the so-called "Absolute Priority Rule." 11 U.S.C. 1129(b)(2)(B). The Absolute Priority Rule is satisfied if "any claim or interest that is junior to the claim of [a class of unsecured claims] will not receive or retain under the plan on account of such junior claim or interest any property . . . ." Id. The Plan proposes to pay unsecured claimants a fraction of their allowed claims, and thus the Debtor must satisfy the Absolute Priority Rule. The Debtor does not meet the Absolute Priority Rule, however, because the Plan provides that equity holders, which are junior to the class of unsecured creditors, will retain their interests.

31.     The Debtor relies on the "new value" exception to the Absolute Priority Rule, which would permit the Debtor's members to retain their equity interests, provided they "contribute capital that is new, substantial money or money's worth, necessary for a successful reorganization and reasonably equivalent to the value or interest received." In re Gramercy Twins Assocs., 187 B.R. 112, 126 (Bankr. S.D.N.Y. 1995). "For purposes of the new value 'exception,' the debtor must show not only that it needs funds to reorganize but rather that it is necessary for old equity to contribute those funds. . . . In other words, under the 'necessary' requirement of the new value exception, old equity must be willing to contribute more money than any other source or it must be the lender of 'last resort.'" In re Coltex Loop Cent. Three Partners, L.P., 203 B.R. 527, 535 (S.D.N.Y. 1996), affirmed, 138 F.3d 39 (2d Cir. 1998). To carry its burden on this issue, "the debtor must be able to satisfy the bankruptcy court, with tangible proof, that the debtor would be unable to obtain funds from any other source or that no other source was willing to infuse the same amount of capital as old equity." Id.

32.     Here, the Debtor has not put forward evidence to establish it meets the "new value" exception. Specifically, it has failed to demonstrate that the $67,500 its members propose to contribute is (i) substantial money that (ii) must be contributed by the Debtor's members and (iii) is reasonably equivalent to the value of the new equity. The case of In re One Times Square Assocs. Ltd. Partnership, 159 B.R. 695 (Bankr. S.D.N.Y. 1993), illustrates that the proposed contributions of the Debtor's members are inadequate to satisfy the "new value" exception. In that case, the debtor was a single-asset debtor owning real property valued at $19,000,000, in which the debtor had no equity. Under the plan, the debtor's limited partners would contribute $1,590,000 in cash (approximately 8% of the value of the property), on or before the effective date and would retain their equity interests. The Court found that "the proposed new infusion of

-10-

capital is not reasonably equivalent to the interests being received by the limited partners." Id. at 709. In reaching its decision, the Court considered the case of In re Miami Center Associates, Ltd., 144 B.R. 937 (Bankr. S.D. Fla. 1992), in which case the Court held that a cash infusion of $2,000,000 by the debtor's partners in exchange for retaining an interest in the debtor's property, valued at $18,550,000 (approximately 11% of the value of the property), was inadequate to satisfy the "new value" exception.

33.    Here, the Debtor's members propose to retain their equity interest in the Property, which Property they value at $750,000 (Local Rule 1007 Affidavit, Exhibit A), while they are only prepared to contribute $67,500 in "new value." Disclosure Statement, p. 11, ¶30. This "infusion" is 9% of the Debtor's estimated value of the Property, and thus is proportionally similar to the 8-11% that has been found insufficient to constitute "new value" in the above-cited cases. As in In re One Times Square Assocs. Ltd. Partnership, the proposed new infusion of capital is not "substantial" or "reasonably equivalent" to the interest being received by the Debtor's members. Thus, the Debtor's members cannot satisfy the "new value" exception.

## II.    THE DEBTOR WILL BE UNABLE TO OBTAIN THE ACCEPTANCE OF AN IMPAIRED CLASS OF CREDITORS AND THEREFORE CANNOT SATISFY §1129(A)(10)

34.    The Debtor must satisfy §1129(a)(10) of the Bankruptcy Code, which provides that if there is one or more impaired classes of claims, at least one such impaired class must accept the Plan, without including any acceptance of the plan by any insider. Here, Classes 1 and 2 are impaired, and Class 3 is an insider class consisting of the equity interests of the Debtor's principals. Plan, p. 5, §§2.1-2.3. Thus, the Debtor must obtain the acceptance of Class 1 or Class 2 to satisfy §1129(a)(10).

35.    Under §1126, a class has accepted the Plan if creditors holding at least two-thirds in amount and more than one-half in number of the allowed claims have voted to accept the Plan.

It follows that where a single creditor holds more than one-third in amount of the allowed claims of a particular class and rejects the plan, such creditor controls the votes of the class.

36.     The Lender holds more than one-third in amount of the allowed claims for each non-insider, impaired class of claims, and has voted in each instance to reject the Plan.

37.     With respect to Class 1, the Lender is the only claimant in this class (Plan, p. 5, §2.1), and therefore controls the votes of Class 1. The Lender has rejected the Plan, and thus the Debtor has not obtained the acceptance of Class 1.

38.     With respect to Class 2, the Lender's Claim is in the amount of $841,224.05 (consisting of amounts set forth in the Judgment and additional interest and attorneys' fees through the petition date), while the Debtor contends that the real property is worth approximately $750,000. See Local Rule 1007 Affidavit, Exhibit A. According to the Debtor's estimation of the value of the real property, the Lender holds a secured claim in the amount of $750,000 and an unsecured claim in excess of $90,000. The other unsecured creditors hold claims in the amount of approximately $150,000 (see Disclosure Statement, p. 12, ¶34, and Schedule F (Docket No. 25)), and thus, the entire pool of unsecured creditors is in the amount of approximately $240,000. The Lender's unsecured claim in the amount of at least $90,000 is more than one third in amount of all claims of unsecured creditors, and therefore the Debtor cannot obtain the acceptance of at least two-thirds in amount (i.e., $160,000) of claims in Class 2 without the Lender's acceptance of the Plan. The Lender has rejected the Plan, and thus the Debtor cannot obtain the acceptance of Class 2. Thus, the Debtor cannot obtain the acceptance of Class 1 or Class 2 and therefore cannot satisfy §1129(a)(10).

ME1 11518034v.1

## III. THE DEBTOR WILL BE UNABLE TO SATISFY THE "FEASIBILITY" REQUIREMENT OF §1129(a)(11)

39. Under §1129(a)(11), a plan may not be confirmed if confirmation is likely to be followed by the liquidation or reorganization of the Debtor, the so-called "feasibility" requirement. To establish feasibility, the Debtor must prove that the Plan has a "reasonable likelihood of success." In re Drexel Burnham Lambert Group, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992).

40. The Debtor will be unable to show that it meets the feasibility requirement with respect to the immediate payments required for confirmation and the post-confirmation payments called for under the Plan.

41. The Debtor requires approximately $80,000 to fund the Plan. Disclosure Statement, p. 11, ¶30. The Debtor claims that its principals are prepared to contribute $67,500 to fund the Plan, however, there is nothing indicating the extent to which the Debtor's principals have funds available to contribute to the Plan. In addition, to fund the balance of $12,500, the Debtor relies on the use of funds allegedly being held in escrow by the Lender. Disclosure Statement, p. 11, ¶30. Yet the Debtor cites no authority under the Bankruptcy Code providing that it is allowed to recover such funds from the Lender and use them as a means to reorganize. As such, there can be no reliance on these funds for purposes of confirmation. The Debtor will be unable to fund the Plan.

42. The Debtor will also be unable to show that the Property generates sufficient cash to support the interest payments required under a "cram-down." The rent roll for the Property is approximately $8,000 per month, while actual collections during the period August, 2010,

ME1 11518034v.1

through March, 2011, averaged approximately $7,000 per month.[1]  Current debt service and

expenses for the Property are approximately $7,000 per month.  Local Rule 1007 Affidavit, ¶6

and Exhibit B.  The Debtor has provided no analysis or evidence that it will be able to timely pay

the "cram down" payments while paying property expenses.  As such, the Debtor will be unable

to prove that the proposed "cram-down" has a "reasonable likelihood of success."  In re Drexel

Burnham Lambert Group, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992).  For the foregoing

reasons, the Debtor will be unable to satisfy §1129(b) of the Bankruptcy Code.

## IV. CERTAIN PROVISIONS OF THE PLAN ARE WITHOUT SUPPORT UNDER THE BANKRUPTCY CODE

43.     Certain Plan provisions are without support under the Bankruptcy Code.  Under

the Plan, the Debtor attempts to redefine the obligations of the Lender following an "Event of

Default" and to impose an injunction against the Lender.  See Plan, §§ 11.2 and 13.1.  The

Debtor does not offer any legal basis for the modification of the Loan Documents in this manner,

and thus the proposed modifications may not properly be included in the Plan.

## V. THE RENTS, WHICH HAVE BEEN ABSOLUTELY ASSIGNED TO THE LENDER, MAY NOT BE USED BY THE DEBTOR TO FUND A PLAN OF REORGANIZATION

44.     The Rents belong to the Lender and may not be used by the Debtor to fund a plan

of reorganization.  Unless the Debtor can demonstrate that it has a license under the Loan

---

[1] See March, 2011, Operating Report (Docket No. 85), p. 3 (showing collections of $8,000);
February, 2011, Operating Report (Docket No. 82), p. 4 (showing collections of $5,600);
January, 2011, Operating Report (Docket No. 79), p. 4 (showing collections of $7,200);
December, 2010, Operating Report (Docket No. 67), p. 5 (showing collections of $6,400);
November, 2010, Operating Report (Docket No. 58), p. 3 (showing collections of $8,000);
October, 2010, Operating Report (Docket No. 51), p. 3 (showing collections of $7,200);
September, 2010, Operating Report (Docket No. 47), p. 3 (showing collections of $4,800); and
August, 2010, Operating Report (Docket No. 41), p. 3 (showing collections of $6,400 for the
month of August, 2010, and $1,600 for the month of September, 2010).

ME1 11518034v.1

Documents to collect the Rents, any plan put forth by the Debtor that proposes to use the Rents is not confirmable as a matter of law.

45.     The Loan Documents clearly provide that the Rents were absolutely assigned to the Lender.  The Assignment of Rents provides that "this Assignment constitute[s] a present, absolute assignment and not an assignment for additional security only."  Declaration of Alex Guggenheim (Docket No. 16), ¶6, Exhibit D, §1 (p. 1) (emphasis added).  Thus, the Rents were absolutely assigned to the Lender upon execution of the Loan Documents.

46.     Even if, in direct contradiction to the plain language of the parties' agreement, the Rents were somehow not absolutely assigned to the Lender and were instead merely pledged as security, the Lender took sufficient steps pre-petition to perfect that interest.  Under New York law, if rents are pledged as security only, a lender's right to the rents becomes absolute upon demanding possession of the mortgaged premises or by lawfully entering the premises and demanding the rents.  See Mutual Life Ins. Co. of N.Y. v. Gotham Silk Hosiery Co., 179 Misc. 557, 561 (Sup. Ct. 1943), judgment aff'd on other grounds, 266 A.D. 844 (1st Dep't 1943); ("Nothing more need have been done by plaintiff to perfect its legal right to collect the rents due . . . than . . . to enter upon the premises and to demand and receive the rent from the tenant."); see also 1180 Anderson Ave. Realty Corp. v. Mina Equities Corp., 95 A.D.2d 169, 173-174 (1st Dep't 1983) ("Where the mortgage . . . gives the mortgagee the right upon default to enter upon and take possession of the mortgaged premises, and receive the rents and profits, the assignment becomes absolute upon the mortgagee making formal demand for and being refused possession. Under such a clause, lawful entry or demand for possession is a condition precedent to a right to the rents." (internal quotations omitted)).

-15-

47.     As set forth more fully in the Lender's Objection to the Debtor's Use of Cash Collateral (Docket No. 16), in this case the Lender perfected its interest in the Rents pre-petition by (a) demanding from the Debtor possession of the real property and the Rents and (b) obtaining, in a pre-petition foreclosure action, a Foreclosure Judgment and an Order from the Court directing the turnover of the Rents to the Lender. See id., ¶4. By virtue of the Lender's pre-petition perfection of its interest in the Rents, the Rents belong to the Lender and the Debtor is not entitled to use the Rents to fund a plan of reorganization.

48.     When a lender has an absolute interest in the rents, the debtor retains, at most, "a residual interest in the rents assigned." In re Constable Plaza Associates, L.P., 125 B.R. 98, 103 (Bankr. S.D.N.Y. 1991). Accordingly, "the cash flow from the rents itself until the mortgage is satisfied is not property of the estate and cannot be used by the Debtor to fund the plan." In re Loco Realty Corp., 2009 Bankr. LEXIS 1724, *18-19 (Bankr. S.D.N.Y. June 25, 2009) (emphasis added; attached); see In re Soho 25 Retail, LLC, Case No. 10-15114 (SHL), *26 (Bankr. S.D.N.Y. March 31, 2011) (attached) ("the rents are not property of the estate because the Debtor had, at most, a revocable license in the rents at issue—a license that was revoked by the Lender prior to the Petition Date"). Since the Rents belong to the Lender and are not property of the Debtor's Estate, they may not be used by the Debtor to fund the Plan.

49.     The Debtor has relied on In re Constable Plaza Associates, L.P., 125 B.R. 98, 103 (Bankr. S.D.N.Y. 1991), in support of its position that an assignment of rents is merely collateral, as opposed to an absolute assignment (see Debtor's Reply to Objections of UST and US Bank to Cash Collateral Use (Docket No. 21), ¶5), but this case is readily distinguishable. In In re Constable Plaza Associates, L.P., the Court ruled that the lender made a prima facie case that a pre-petition perfection of an assignment of rents "transferred all title and interest in the rents

-16-

prior to the commencement of the debtor's Chapter 11 case. However, the assignment of rents clause in the mortgage specifically states that such assignment was 'as additional security for the indebtedness.' . . . [T]he appearance in the assignment of rents clause of the phrase 'as additional security' lends . . . support to the conclusion that the parties contemplated that no absolute assignment of the rents was to take effect upon the occurrence of a default and that further action was required by the mortgagee, such as the appointment of a receiver, before [it] was entitled to collect the rents." Id. at 101-102.

50. Here, however, the Assignment of Rents provides that "this Assignment constitute[s] a present, absolute assignment and not an assignment for additional security only." Declaration of Alex Guggenheim (Docket No. 16), ¶6, Exhibit D, §1 (p. 1) (emphasis added). The Assignment of Rents further provides that "If an Event of Default occurs, . . . [Lender] shall immediately be entitled to possession of all Rents . . . whether or not [Lender] enters upon or takes control of the Property." Id. (emphasis added). Thus, unlike the assignment of rents provision at issue in In re Constable Plaza Associates, L.P., the Assignment of Rents here expressly evidences the parties' intent that the Rents are absolutely assigned, are not merely collateral, and that no further action is required by the Lender before it is entitled to collect the Rents. Moreover, even if the Assignment of Rents was somehow not a present assignment of the Rents and was a pledge of the Rents as security only, the Lender took sufficient steps pre-petition to perfect its right to receive the Rents. Thus, the Debtor may not use the Rents to fund a plan of reorganization.

## **RESERVATION OF RIGHTS**

51. The Lender reserves all other objections to confirmation of the Plan where the Debtor fails to provide evidence to factually or legally support the terms of the Plan.

-17-

## CONCLUSION

52.    For the foregoing reasons, the Lender respectfully submits that confirmation of

the Debtor's Plan should be denied.

Dated: April 27, 2011

McCARTER & ENGLISH, LLP
Attorneys for U.S. Bank, N.A., as Trustee for the
Registered Holders of Countrywide Commercial
Mortgage Trust 2007-MF1, Commercial
Mortgage Pass-Through Certificates, Series 2007-
MF1

By:    /s Joseph Lubertazzi, Jr.
Joseph Lubertazzi, Jr.
A Member of the Firm
245 Park Avenue, 27th Floor
New York, NY 10167
Phone: (212) 609-6800
Fax: (212) 609-6921

-and-

Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Phone: (973) 622-4444
Fax: (973) 624-7070

-18-



LEXSEE 2011 BANKR. LEXIS 723

**In re: 20 BAYARD VIEWS, LLC, Debtor.**

**Chapter 11, Case No. 09-50723-ess**

**UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF NEW YORK**

**2011 Bankr. LEXIS 723**

**March 7, 2011, Decided**

**COUNSEL:** [*1] For the Debtor: John S. Mairo, Esq., Warren J. Martin Jr., Esq., Porzio, Bromberg & Newman, P.C., Morristown, NJ.

For W Financial Fund, LP: Andrew C. Gold, Esq., Hanh V. Huynh, Esq., Frederick E. Schmidt, Esq., Herrick, Feinstein LLP, New York, NY.

For United States Trustee: William E. Curtin, Esq., Office of the United States Trustee, Brooklyn, NY.

For the Debtor: Leslie A. Berkoff, Esq., Lia M. Pistilli, Esq., Moritt Hock Hamroff & Horowitz LLP, Garden City, NY.

For Bayard Views Condominium Association: Avrum J. Rosen, Esq., The Law Offices of Avrum J. Rosen, PLLC, Huntington, NY.

**JUDGES:** HONORABLE ELIZABETH S. STONG, UNITED STATES BANKRUPTCY JUDGE.

**OPINION BY:** ELIZABETH S. STONG

**OPINION**

MEMORANDUM DECISION ON CONFIRMATION OF THIRD AMENDED PLAN OF REORGANIZATION

**HONORABLE ELIZABETH S. STONG
UNITED STATES BANKRUPTCY JUDGE**

Before this Court is the confirmation of the Third Amended Plan of Reorganization, as modified (the "Plan"), filed by 20 Bayard Views, LLC in this Chapter 11 case. The Debtor developed a 62-unit residential condominium complex in Williamsburg, Brooklyn, and beginning in 2007, sales of these luxury units beginning were strong. But as the economy faltered in the second half of 2008, these sales declined [*2] dramatically. The Debtor shifted its strategy from one based on sales to one based on rentals, and new financing was put in place. But this too proved unsuccessful, and in late 2009, this Chapter 11 bankruptcy case followed.

The Debtor's Plan is premised on the sale of 27 of the 37 unsold condominium units over five years. W Financial Fund, LP ("WFF"), the Debtor's largest secured creditor, objects to confirmation. WFF argues the Plan should not be confirmed primarily because it does not satisfy the cramdown requirements of Bankruptcy Code Section 1129(b). WFF also argues the Plan does not satisfy the feasibility requirement of Bankruptcy Code Section 1129(a)(11), and was not proposed in good faith as required by Section 1129(a)(3).

A confirmation hearing was held over eleven days, commencing in October 2010 and concluding in January 2011, at which the Debtor and WFF, by counsel, appeared and were heard and evidence was received. The

record was closed on January 4, 2011, and the matter was submitted for decision on March 7, 2011.

Based on the entire record, including the testimony, exhibits, and arguments of counsel, and for the reasons set forth below, this Court concludes that the Plan [*3] cannot be confirmed because it does not satisfy Section 1129(b)'s cramdown requirements. Specifically, the Debtor has not established by a preponderance of the evidence that the Plan treats WFF fairly and equitably by providing it with the present value of its claim as required by Bankruptcy Code Section 1129(b)(2)(A)(i)(II).

**Jurisdiction**

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(1). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).

**Background**

*Procedural History*

The Debtor filed a voluntary petition for relief under Chapter 11 on December 4, 2009. The Debtor is a debtor in possession and no trustee, examiner, or official committee of unsecured creditors has been appointed. On March 3, 2010, this Court entered an Order establishing April 1, 2010, as the deadline for creditors to file a proof of claim. WFF filed a timely proof of claim asserting that it holds a secured claim of $18,163,756.85, plus any interest, fees and costs that continue to accrue. WFF included post-petition interest at the contract default rate of 24 percent as part of its claim.

The Debtor filed an objection to WFF's proof of claim on April 19, 2010, challenging the 24 percent [*4] post-petition interest rate. On August 16, 2010, following an evidentiary hearing, this Court overruled the Debtor's objection, and fixed the pendency interest for WFF's secured claim at 24 percent. The Debtor filed a Notice of Appeal to the District Court on August 25, 2010. That appeal remains pending.

On May 20, 2010, the Debtor filed a Third Amended Plan of Reorganization and Disclosure Statement, both dated as of May 13, 2010. The Disclosure Statement was approved by a Consent Order entered on May 20, 2010.

WFF filed an objection to confirmation of the Plan on September 8, 2010 (the "WFF Objection") arguing, among other things, that the Plan is not fair and equitable

with respect to WFF's claim, the Plan is not feasible, and the Plan has not been proposed in good faith. On September 10, 2010, the Debtor filed a modified Third Amended Plan of Reorganization which reduced the length of the Plan from seven years to five years, increased the interest rate paid to WFF from 3.5 percent to 4.5 percent, and increased the amount of condominium unit sale proceeds to be delivered to WFF from 85 percent to 95 percent.

The parties filed a Joint Pre-Trial Statement on September 28, 2010, which [*5] describes the issues before the Court and lists the Debtor's and WFF's anticipated witnesses. The next day, the Debtor filed a response to the WFF Objection (the "Debtor Reply") and certification of the votes cast in connection with the Plan (the "Certification of Votes"). The Certification of Votes states that WFF is the only impaired class to vote against confirmation of the Plan, and that the other impaired classes either voted in favor of confirmation or abstained.

The Debtor filed a second modified Plan on October 26, 2010, which provides that WFF will receive 25 percent of all distributions made by the newly reorganized Debtor to the property's equity holders. On December 1, 2010, the Debtor filed a third modified Plan which amends the definition of "Managing Member" and removes language that provided an injunction with respect to lawsuits against the guarantors of the WFF mortgage. Finally, the Debtor filed a fourth modified Plan on January 18, 2011, which restates certain Plan terms and increases the interest rate to be paid to WFF from 4.5 to 4.75 percent. The Debtor also filed a supplemental memorandum of law in support of confirmation. On January 24, 2011, WFF filed a reply [*6] asking the Court not to consider the fourth modified Plan and the supplemental memorandum of law since they were submitted after the record was closed.

Pursuant to the Stipulation and Order entered on November 10, 2010, the parties agreed, and this Court ordered, that for purposes of confirmation of the Plan, the value of WFF's pre-petition collateral is $20,575,000. The parties also agreed, and this Court ordered, that the amount of WFF's claim is fixed at $20,575,000.

*Factual Background*

In 2007, the Debtor completed construction on a 62-unit luxury residential condominium complex located at 20 Bayard Street in Williamsburg, Brooklyn (the

"Property"). The development project was originally financed by a loan from Fremont General, which was later acquired by iStar Loans, LLC ("iStar"). The Debtor also invested approximately $16 million of its own funds in the project. Although the sales of the condominium units proceeded well at the outset, the "sale momentum slowed dramatically in the second half of 2008 due to the faltering economy and the attendant widespread residential real estate decline. By the third quarter of 2008, the Debtor had sold 24 of the 62 condominium units." Ehrenfeld Dec. at 3.

In [*7] light of the prevailing economic conditions, the Debtor decided to rent the unsold units. But under the terms of the iStar loan agreement, the Debtor could not rent the units without first obtaining a waiver from iStar. iStar declined to waive the prohibition against leasing the units, and as a result, the Debtor began to search for a new lender.

Unable to locate a conventional lender to refinance the iStar loan, the Debtor entered into a one-year loan with WFF to provide additional time to locate long-term financing. WFF is a bridge lender that makes short-term loans, generally for a term of one year or less. On October 14, 2008, the Debtor and WFF executed an Agreement of Consolidation, Extension and Modification of Mortgage, which substituted WFF for iStar as the mortgagee. The Debtor also executed in favor of WFF a Consolidated, Amended and Restated Note (the "Note") in the principal amount of $17.4 million (the "Loan").

The Note is secured by collateral including the 37 unsold condominium units and 40 parking spaces located at the Property, as well as the related rents and leases. The Note is also supported by a Guaranty (the "Guaranty") executed on October 14, 2008, by Chaim Lax, [*8] Moshe Lax and Yitzchok (a/k/a Isaac) Hager (the "Guarantors") in the amount of $8.7 million of the Loan's principal amount, plus any accrued interest, fees, and costs. And the Note is supported by the Pledge Agreement, dated October 14, 2008, entered into by the Debtor's equity holders, Jack Weingarten, LX Holdings, LLC, and Mr. Hager (the "Equity Holders"), in which they pledge their membership equity interests in the Debtor as security for the payment and performance of all obligations under the Guaranty and the Note.

Before the Note's original maturity date of October 13, 2009, the Debtor and WFF agreed to extend the maturity date for three months, to January 13, 2010. As

consideration for the extension, WFF was paid a fee of $84,875.36, as well as its legal fees.

In the spring of 2009, the Debtor began contacting banks to refinance the Loan. On April 21, 2009, the Debtor received a loan application letter from Capital One Bank, N.A. for a five-year first mortgage loan of $13.5 million at a loan-to-value ratio of 70 percent. The proposed interest rate, to be finalized upon the issuance of a loan commitment, was 6.125 percent.

A few months later, the Debtor received two loan application [*9] letters from Manufacturers and Traders Trust Company ("M&T Bank"), dated June 22, 2009, and June 25, 2009. Both letters stated that M&T was willing to consider providing the Debtor a five-year first mortgage loan up to the lesser of $15 million or 75 percent of the value of the Property. The first letter fixed the interest rate on the proposed loan at 250 basis points above the five-year Cost of Funds Index and a minimum rate of 6.25 percent. M&T Bank also required the Debtor to deposit $5 million and to maintain an account balance of at least $1 million during the term of the loan. The second letter included substantially similar terms, with a proposed interest rate of 250 basis points above the five-year Cost of Funds Index and a minimum rate of six percent. And the second letter also required the Debtor to deposit $5 million at M&T Bank and to maintain a balance of $1 million for the duration of the loan, and further specified that the $1 million would serve as additional collateral for the proposed loan.

The Debtor continued its efforts to refinance the Loan, and on October 5, 2009, the Debtor received a third executed loan application letter from M&T Bank. This letter proposed [*10] a five-year first mortgage loan up to the lesser of $15 million or 75 percent of the value of the Property. The proposed interest rate was set at 375 basis points above the five-year Cost of Funds Index and a minimum rate of seven percent. This amount was some $2 million less than the amount then owed to WFF. M&T Bank also required the Debtor to deposit $5 million for at least six months from closing and maintain a balance of at least $2 million throughout the term of the loan. M&T Bank required the $2 million to be held as additional collateral for the proposed loan. The Debtor could not meet the requirement to maintain the $5 million deposit as required by the bank, and did not refinance the Loan with M&T Bank. On December 4, 2009, before the Note matured, the Debtor commenced this bankruptcy case.

*The Plan*

The Plan provides for payment to seven classes of claims and interests, and separately provides for payment in full of all allowed administrative claims, priority tax claims, and compensation to professionals. Payment of administrative claims, priority claims, and compensation to professionals will be funded by contributions from the Equity Holders and the Guarantors. One of the [*11] Equity Holders, Mr. Weingarten, will contribute these funds to the Plan.

The Plan creates several classes including Class 1-priority claims, Class 2-WFF's secured claim, Class 3-the secured mechanic lien claim of Karl Fischer Architecture, Class 4-the secured mechanic lien claim of S&S Socius Inc., Class 5-the secured mechanic lien claim of ADD Plumbing, Inc., Class 6-general unsecured claims, and Class 7-equity security holders. All of the classes are impaired, except for Class 1.

Class 1 -- Priority Claims The Plan provides that allowed priority claims are paid in full on the Plan's effective date or on the distribution date immediately after a priority claim becomes an allowed claim, excluding payment of any interest accruing from the petition date.

Class 2 -- Secured Claims WFF is the sole holder of a Class 2 claim. The Plan provides that WFF retains the liens on its pre-petition collateral and receives an additional lien on any leases related to the condominium storage units. The Plan also provides that during the payout period, the Debtor will provide WFF with proof of tax payments and insurance. And the Plan provides for monthly interest payments of 4.75 percent on the principal, [*12] with the first payment to be made in the month in which the Plan becomes effective.

The Plan further provides that the Debtor will begin to pay down the principal within one year of the effective date, with an initial payment of $700,963. The Debtor will continue to make principal paydowns on or before the second, third, fourth, and fifth anniversary of the Plan's effective date in the amounts of $2,803,853, $4,331,953, $5,205,564, and $7,415,656, respectively. With the final principal payment of $7,415,656, the Debtor will pay off the remaining principal balance of WFF's claim. The principal paydowns may also be made earlier than required without any prepayment penalty.

As an alternative source of principal paydowns, the Plan provides that for five years following the effective date, the Debtor will calculate its excess net cash flow, as defined in the Plan and remit any excess funds to WFF. These payments will be credited against the required annual principal paydowns.

The Plan further provides that for five years following the effective date, the Debtor will not sell any condominium units for less than $500 per square foot, and that when a condominium unit is sold, 95 percent of the [*13] net proceeds will be deposited in an interest-bearing account for the benefit of WFF to be applied to a principal paydown. The remaining five percent of proceeds will be deposited in an interest-bearing account as a reserve for Plan payments to WFF, the secured mechanic lien holders, and the general unsecured creditors. And the Plan provides that WFF will receive 25 percent of all distributions made by the reorganized Debtor to holders of any equity security interests.

Classes 3, 4, and 5 -- Other Secured Claims Classes 3, 4, and 5 receive the same treatment under the Plan. These claimants retain their liens and are paid in full within three years of the effective date. These claimants will receive 33.3 percent of their allowed claim plus accrued interest at a rate of 3.5 percent on the first, second, and third anniversaries of the Plan's effective date. All payments are subject to the "WFF Allowed Claim Contingency," which provides that if the District Court confirms that the pendency interest is 24 percent or the Plan's confirmation interest rate is above 3.5 percent, the Debtor may "defer each of the payments to the [claimants in Classes 3, 4, and 5]. . . for one year so that the [*14] payments . . . would occur in years two, three and four following the Effective Date." Plan Art. I(B)(98).

Class 6 -- General Unsecured Creditors The Plan provides that treatment of Class 6 general unsecured creditors is contingent upon the outcome of the Debtor's appeal of this Court's determination that WFF is entitled to pendency interest at a rate of 24 percent. If the pendency interest is set at 12 percent, then the general unsecured creditors will receive 50 percent of their allowed claims. And if WFF's pendency interest remains at 24 percent, then general unsecured creditors will receive seven percent of their allowed claims. The Plan provides that the distribution to unsecured creditors will

be made in three equal payments on or before the second, third, and fourth anniversary of the Plan's effective date. And in either circumstance, holders of related party claims, specifically Bayard Park LLC, Mr. Weingarten, LX Holdings, and South 4th Street, do not receive a distribution under the Plan.

Class 7 -- Equity The Plan provides that Equity Holders retain their equity interest and receive an equal equity interest in the reorganized Debtor, but only if they contribute to the funding [*15] of the Debtor's payment of administrative and priority claims and compensation to professionals. At the confirmation hearing, Mr. Weingarten testified that he is the only Equity Holder contributing to the Debtor's exit financing and accordingly, he will become the sole Equity Holder and the managing member (the "Managing Member") of the reorganized Debtor.

Although the Plan does not require the sale of condominium units to fund the Plan payments, Exhibit B to the Disclosure Statement sets forth the Debtor's projections for the sale of the condominium units and the Debtor's projected income for the duration of the Plan. As the Plan has been modified by the Debtor, these projections have been revised to correspond to the modified Plan. The most recent projections, filed in connection with the fourth modified Plan (the "Projections"), reflect that the Debtor aims to sell one condominium unit in year one, four units in year two, six units in year three, seven units in year four, and nine units in year five. After the completion of the Plan, the Debtor will retain ten condominium units and all of the parking spaces.

*The Confirmation Hearing*

Trial on the confirmation of the Plan took place [*16] over eleven days commencing on October 6, 2010. The Court heard the testimony of eight expert and fact witnesses and received more than fifty exhibits into evidence. WFF objects to confirmation of the Plan for three reasons. First, WFF argues that the Plan does not satisfy the fair and equitable requirements of Bankruptcy Code Section 1129(b). Next, WFF argues that the Plan is not feasible, as required by Bankruptcy Code Section 1129(a)(11). And finally, WFF argues that the Debtor has not satisfied the good faith requirement of Bankruptcy Code Section 1129(a)(3).

The Debtor called five witnesses to testify in support

of the Plan. The Court heard testimony from Richard DiGeronimo, a certified general real estate appraiser and President/Founder of R. D. Geronimo Ltd. Mr. DiGeronimo testified as an expert in real estate valuation. The Court also heard testimony from Irving Schwarzbaum, a certified public accountant and director at J.H. Cohn LLP, an accounting, consulting, financial and restructuring firm. Mr. Schwarzbaum testified as to the Debtor's financial projections and liquidation analysis. The Debtor also offered the expert testimony of Paul Fried, a Managing Director at Traxi LLC, [*17] an advisory firm that provides financial analysis and arranges financing for distressed properties. Mr. Fried testified on risk and interest rates in real estate workout situations. The Court received testimony from Mr. Weingarten, who testified as to his financial contributions to the Plan and the Debtor's post-confirmation management strategy. Finally, the Court heard testimony from Martin Ehrenfeld, the Debtor's Restructuring Officer, who testified as to the Plan's terms and matters relating to the restructuring of the Debtor.

WFF called three witnesses to testify in opposition to confirmation. The Court heard expert testimony from Anthony Iaccio, a certified general real estate appraiser and principal at Blake & Iaccio LLC, who testified about the value of the property. The Court also heard expert testimony from Stuart Bruck, a Director of Funding and Mortgage Brokerage at Time Equities, Inc., on interest rates and risk with respect to residential buildings. And finally, the Court heard the testimony of David Heiden, a principal at WFF, who testified regarding WFF's claim, the Debtor's projections, and the condominium sales market.

**Discussion**

As the proponent of the Plan, the Debtor [*18] must establish by a preponderance of the evidence that each of the confirmation requirements set forth in Bankruptcy Code Section 1129 has been met. *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.)*, 994 F.2d 1160, 1165 (5th Cir. 1993) (observing that "[t]he combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown"); *In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401, 2003 WL 23861928, at *46 (Bankr. S.D.N.Y. Oct. 31, 2003) (citing

*Briscoe*, 994 F.2d at 1165). The Court considers each of these requirements in turn.

*Bankruptcy Code Section 1129(a)(1)*

Bankruptcy Code Section 1129(a)(1) requires that "[t]he plan compl[y] with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). Courts interpret this language to mean that a plan must meet the requirements of Bankruptcy Code Sections 1122 and 1123. *See, e.g., In re EnviroSolutions of New York, LLC*, 2010 Bankr. LEXIS 2840, 2010 WL 3373937, at *2-3 (Bankr. S.D.N.Y. July 22, 2010).

Section 1122 addresses the classification of claims or interests. In particular, Bankruptcy Code Section 1122(a) [*19] provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other class or interest of such class." 11 U.S.C. § 1122(a). Section 1122(a) is satisfied "when a reasonable basis exists for the structure, and the claims or interests within each particular class are substantially similar." *In re PC Liquidation Corp.*, 2006 Bankr. LEXIS 4638, at *13 (Bankr. E.D.N.Y. Nov. 13, 2006). *See In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d Cir. 1987).

Here, in accordance with Section 1122(a), Article III of the Plan classifies the claims and interests into seven classes, each containing substantially similar claims and interests. Thus, the Debtor has established by a preponderance of the evidence that the Plan satisfies Section 1122(a).

Section 1123(a)(1) addresses the contents of a plan. This Section requires that a plan designate classes of claims and interests. 11 U.S.C. § 1123(a)(1). Here, consistent with this requirement, Article III of the Plan adequately classifies the claims and interests. Administrative claims and priority tax claims do not require designation under Section 1123(a)(1). *PC Liquidation*, 2006 Bankr. LEXIS 4638, at *12. [*20] Thus, the Debtor has established by a preponderance of the evidence that the Plan satisfies the requirements of Section 1123(a)(1).

Sections 1123(a)(2) and (a)(3) require that a plan specify which classes are unimpaired and which classes are impaired under the plan. 11 U.S.C. § 1123(a)(2)-(3). Here, Article III of the Plan clearly provides that Class 1 is unimpaired and Classes 2 through 7 are impaired under

the Plan. Therefore, the Debtor has established by a preponderance of the evidence that Sections 1123(a)(2) and (3) are satisfied.

Section 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). Here, in accordance with Section 1123(a)(4), Article III of the Plan provides the same treatment for each claim or interest of a particular class. As a result, the Debtor has established by a preponderance of the evidence that the requirements of Section 1123(a)(4) are met.

Section 1123(a)(5) requires that "a plan . . . provide adequate means of implementation of the plan." *PC Liquidation*, 2006 Bankr. LEXIS 4638, at *14. [*21] Here, Article VI of the Plan sets forth several provisions to facilitate the implementation of the Plan, including the continued corporate existence of the Debtor, the operations of the reorganized Debtor, the post-effective date management of the reorganized Debtor, the effectuation of the transactions contemplated by the terms and conditions of the Plan, and the vesting of the Debtor's estate in the reorganized Debtor and the release of all liens, except for WFF's claim and the secured claims of Classes 3, 4, and 5. Accordingly, the Debtor has established by a preponderance of the evidence that the Plan satisfies Section 1123(a)(5).

Section 1123(a)(6) "requires a plan to provide for the inclusion in the charter of the debtor, if the debtor is a corporation . . . a provision prohibiting the issuance of non-voting equity securities." *PC Liquidation*, 2006 Bankr. LEXIS 4638, at *16. Consistent with Section 1123(a)(6), the Plan does not provide for the issuance of any equity securities. Rather, the Equity Holders will retain their equity securities only if they comply with the capital call to fund the administrative claims/priority account and professional fees account. As a result, the [*22] Debtor has established by a preponderance of the evidence that the requirements of Section 1123(a)(6) are met.

Section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan . . . ." 11 U.S.C. § 1123(a)(7). Pursuant to Article VI of the Plan, the

operation, management, and control of the reorganized Debtor will be the responsibility of Mr. Ehrenfeld, the Restructuring Officer, and Mr. Weingarten, the Managing Member. The Plan notes that it is not contemplated that Mr. Ehrenfeld and Mr. Weingarten will receive compensation for their roles with the newly reorganized Debtor. This appears consistent with the interests of creditors and equity security holders. Accordingly, the Debtor has established by a preponderance of the evidence that the Plan satisfies the requirements of Section 1123(a)(7).

### *Bankruptcy Code Section 1129(a)(2)*

Bankruptcy Code Section 1129(a)(2) requires that "[t]he proponent of the plan compl[y] with the applicable provisions of this title." 11 U.S.C. § 1129(a)(2). Courts interpret [*23] this language to require that the plan proponent comply with the disclosure and solicitation requirements set forth in Bankruptcy Code Sections 1125 and 1126. *See, e.g., In re Johns-Manville Corp.,* 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986). The Debtor, as proponent of the Plan, has substantially complied with the Bankruptcy Code and Rules provisions regarding disclosure, notice, and solicitation with respect to the Plan, the Disclosure Statement, and other matters in connection with this Chapter 11 case. As noted above, the Court entered a Consent Order approving the Disclosure Statement on May 20, 2010. Thus, the Debtor has established by a preponderance of the evidence that the requirements of Section 1129(a)(2) are met.

### *Bankruptcy Code Section 1129(a)(3)*

Bankruptcy Code Section 1129(a)(3) requires that "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Courts interpret good faith to mean that "there exists 'a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" *Matter of Madison Hotel Assocs.,* 749 F.2d 410, 425 (7th Cir. 1984) (quoting *In re Nite Lite Inns,* 17 B.R. 367, 370 (Bankr. S.D. Cal. 1982)). [*24] A plan is proposed in good faith only if it has "a legitimate and honest purpose to reorganize the debtor." *Mercury Capital Corp. v. Milford Conn. Assocs.,* 354 B.R. 1, 7 (D. Conn. 2006) (internal quotation marks omitted). In addressing the good faith requirement, the Second Circuit noted, "[t]he good faith test means that the plan was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected."

*Kane v. Johns-Manville Corp.,* 843 F.2d 636, 649 (2d Cir. 1988) (quoting *Koelbl v. Glessing (In re Koelbl*), 751 F.2d 137, 139 (2d Cir. 1984)).

As several courts have observed, the good faith requirement should be viewed in light of the totality of the circumstances surrounding the plan, and "the requirement of Section 1129(a)(3) 'speaks more to the process of plan development than to the content of the plan.'" *In re Chemtura Corp.,* 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (quoting *In re Bush Indus.,* 315 B.R. 292, 304 (Bankr. W.D.N.Y. 2004)). Section 1129(a)(3) makes clear "that the proposal of the plan of reorganization [is] to be done in good faith and not in a way that was forbidden by law." *In re Sovereign Grp., 1984-21 Ltd.,* 88 B.R. 325, 328 (Bankr. D. Colo. 1988). [*25] Similarly, the good faith requirement addresses the "conduct manifested in obtaining the confirmation votes of a plan of reorganization and not necessarily on the substantive nature of the plan." *In re Sovereign Grp.,* 88 B.R. at 328 (citing 5 COLLIER ON BANKRUPTCY ¶ 1129.02 (15th ed. 1984)). It does not require the bankruptcy judge to determine whether the ends achieved in the plan contravene non-bankruptcy law. *See In re Ocean Shores Cmty. Club, Inc.,* 1991 U.S. App. LEXIS 22393, 1991 WL 184827, at *2 (9th Cir. Sept. 19, 1991) (observing that "Bankruptcy Code section 1129(a)(3) bars confirmation of plans proposed in violation of law, not those that contain terms that may contravene law"). [1]

> 1 Other sections of the Bankruptcy Code permit a court to review the legality of plan provisions. *See In re Food City,* 110 B.R. 808, 812 n.10 (Bankr. W.D. Tex. 1990) (noting that "[t]his is not to say that a potentially illegal provision is not a relevant consideration in the confirmation process. For example, the legal consequences which might flow from the implementation of a substantive provision which is prohibited by law could affect the plan's feasibility under section 1129(a)(11)").

WFF argues that the Debtor's Plan does [*26] not satisfy the good faith requirement of Section 1129(a)(3). WFF notes that the Debtor received an executed application letter from M&T Bank to refinance and replace WFF as the mortgage holder. Yet, rather than refinance with M&T Bank, the Debtor filed for bankruptcy with the intention of cramming down WFF at an interest rate that is lower than what it could obtain

from a conventional lender.

WFF also asserts that "the Plan doesn't smell right." WFF Objection ¶ 66. WFF points to the August 16, 2010, hearing on the Debtor's motion for a temporary restraining order and injunction to enjoin WFF from state court collection activities against the Guarantors, where it was disclosed that "Mr. Moshe Lax stood to gain membership interests in the Debtor through non-disclosed side agreements with Mr. Weingarten in exchange for his contribution to the Professional Fees Account." WFF Objection ¶¶ 65-66. Since Mr. Lax is not an Equity Holder, he is not entitled to receive equity interests under the Plan.

WFF also argues that the Plan is "proposed by a forbidden means" because it requires the Debtor "amend its Operating Agreement to modify, among other things, the composition of the members of [*27] the Debtor without the consent of WFF." WFF Objection ¶ 65. As WFF explains, the Plan provides that two of the three Equity Holders lose their interests in the Debtor, and accordingly, the Debtor's operating documents must be amended to reflect this change. At the same time, the Pledge Agreement requires WFF's consent to modifications to the operating agreement. Thus, WFF argues that the "Plan runs afoul of section 1129(a)(3)." WFF Objection ¶ 65.

In response, the Debtor asserts that the Plan is proposed in good faith with the expectation that a reorganization can be effected. The Debtor notes that it "has modified its Plan to a 5-year term at a 4.5% [now 4.75 percent] interest rate, despite the fact that the Debtor's [interest rate] expert remains firm in his conclusion that the appropriate interest rate should be no more than 3.9%." Debtor Reply at 49. In addition, the Debtor notes that allegations that the Guarantors are shielding assets have been rejected by other courts. Finally, the Debtor argues that the Plan "achieves one of the primary objectives underlying a Chapter 11 bankruptcy: the equitable distribution of value to creditors for amounts owing, and a breathing spell to [*28] prevent a quick liquidation by a secured creditor at depressed prices." Debtor Reply at 50.

Here, the record shows that the Debtor proposed the Plan with "a basis for expecting that a reorganization can be effected." *Kane v. Johns-Manville*, 843 F.2d at 649. The Debtor's failure to proceed with the M&T Bank transaction does not taint the proposal of the Plan with

bad faith, or amount to a means forbidden by law. The Debtor has identified other, credible reasons for not completing that transaction, including its inability to secure the $5 million cash collateral required by M&T as security, and the prevailing conditions for loans of this type at the time. Accordingly, the Debtor elected to commence this bankruptcy case with the expectation that it could reorganize successfully in Chapter 11.

At the same time, the record does not show that the Debtor engaged in improper conduct to obtain votes in favor of the Plan. Mr. Weingarten testified that he does not have any undisclosed side agreements with the Equity Holders, the Guarantors, or any other party, concerning equity ownership of the reorganized Debtor. Any need to amend the Debtor's operating documents in order to take account of a [*29] change in equity ownership does not amount to a means "forbidden by law." 11 U.S.C. § 1129(a)(3). And the Debtor has proposed several modifications to the Plan to improve the treatment of WFF's claim, and if possible, to obtain WFF's consent to confirmation.

For these reasons, and based on the entire record, the Debtor has established by a preponderance of the evidence that it has proposed the Plan in good faith and not by any means forbidden by law, and therefore, that the requirements of Section 1129(a)(3) are satisfied.

*Bankruptcy Code Section 1129(a)(4)*

Bankruptcy Code Section 1129(a)(4) provides:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4).

Here, the Plan provides that "[t]he Bankruptcy Court must rule on and allow all Professional Fee claims before the fees will be owed and paid." Plan Art. II(C). Accordingly, the Debtor has established by a preponderance of the [*30] evidence that the Plan satisfies the requirements of Section 1129(a)(4).

*Bankruptcy Code Section 1129(a)(5)*

Under Bankruptcy Code Section 1129(a)(5), a debtor must:

> [D]isclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor or a successor to the debtor under the plan, and to show that the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy. Section 1129(a)(5) also requires the disclosure of the identity of any insider that will be employed by the reorganized debtor, and the nature of any compensation for such insider.

*PC Liquidation*, 2006 Bankr. LEXIS 4638, at *21-22.

Following the Plan's effective date, the reorganized Debtor will be managed by Mr. Ehrenfeld, who will continue to serve as the Restructuring Officer, and Mr. Weingarten, who will be the Debtor's Managing Member. The Plan specifically states that it is not contemplated that Mr. Ehrenfeld and Mr. Hagar will receive compensation for their [*31] roles with the reorganized Debtor. As a result, the Debtor has established by a preponderance of the evidence that the Plan complies with Section 1129(a)(5).

*Bankruptcy Code Section 1129(a)(6)*

Bankruptcy Code Section 1129(a)(6) requires that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval." 11 U.S.C. § 1129(a)(6). Upon confirmation of the Plan, the Debtor's business will not involve rates subject to the approval of any governmental regulatory commission. Accordingly, Section 1129(a)(6) does not apply to this case.

*Bankruptcy Code Section 1129(a)(7)*

Bankruptcy Code Section 1129(a)(7) is commonly

referred to as the "best interests test." This Section requires that each impaired class of claims either accept the plan or receive "not less than the amount such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1129(a)(7)(A).

WFF holds the sole claim in Class 2, an impaired class, and voted against confirmation of the Plan. As a result, [*32] Section 1129(a)(7) requires that the Plan must provide WFF with more than it would receive if the Debtor is liquidated under Chapter 7. Based on the Debtor's amended liquidation analysis, each impaired class, including Class 2, receives more under the Plan than it would receive in a liquidation scenario. As the Debtor's accountant and financial advisor Mr. Schwarzbaum testified, in a liquidation scenario the secured creditors would receive 78.7 percent of their claims, while the administrative and unsecured claim holders would receive no distribution. Mr. Schwarzbaum's expert report provided that if the Property is liquidated, it would generate only $16,151,630, resulting in a $4,423,370 loss to WFF.

Therefore, based on the liquidation analysis and Mr. Schwarzbaum's testimony, the Debtor has established by a preponderance of the evidence that the Plan satisfies the "best interests test" and the requirements of Section 1129(a)(7) are met.

*Bankruptcy Code Section 1129(a)(8)*

Bankruptcy Code Section 1129(a)(8) provides that "[w]ith respect to each class of claims or interests (A) such class has accepted the plan; or (B) such class is not impaired under the plan." 11 U.S.C. § 1129(a)(8). According [*33] to the Certification of Votes, Class 2, WFF's class, was the only impaired class to vote against confirmation of the Plan.

But this is not the end of the inquiry. Bankruptcy Code Section 1129(b) permits a plan proponent to "cramdown" a plan over a dissenting class if the plan does not "discriminate unfairly" and provides "fair and equitable" treatment to the dissenting classes that are impaired under the plan. *In re The Leslie Fay Cos.*, 207 B.R. 764, 788 (Bankr. S.D.N.Y. 1997). Before a plan proponent may cramdown a plan, it must establish that all of the other requirements of Section 1129(a) are met. *Id.* Accordingly, the Court will address the remaining requirements of Section 1129(a) before discussing the

cramdown requirements of Section 1129(b).

### Bankruptcy Code Section 1129(a)(9)

Bankruptcy Code Section 1129(a)(9) provides for the mandatory treatment of certain priority claims. As to administrative claims, the statute states:

> Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that . . . with respect to a claim of a kind specified in section 507(a)(2) [administrative expense claims]. . . on the effective date [*34] of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim.

11 U.S.C. § 1129(a)(9)(A).

Here, the Plan provides that the administrative claims will be paid in full "on (i) the Effective Date or (ii) the Distribution Date immediately following the date on which the Administrative Claim becomes an Allowed Administrative Claim . . . ." Plan Art. II(B). Accordingly, the Debtor has established by a preponderance of the evidence that the Plan meets the requirements of Bankruptcy Code Section 1129(a)(9)(A).

Section 1129(a)(9)(B) addresses the treatment of other priority non-tax claims. The statute provides that each holder of a priority non-tax claim will receive:

> (i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the amount allowed of such claim[.]

11 U.S.C. § 1129(a)(9)(B).

Under the Plan, priority non-tax claims are unimpaired Class 1 claims and holders of such claims are paid in full, in cash, on the effective date or on the distribution [*35] date immediately after the Class 1 claim becomes an allowed claim, unless less favorable terms are agreed to in writing. Thus, the Debtor has established by a preponderance of the evidence that the

Plan satisfies the requirements of Section 1129(a)(9)(B).

Finally, the Bankruptcy Code provides for similar treatment for unsecured and secured priority tax claims. For unsecured priority tax claims, the Bankruptcy Code requires:

> [T]he holder of such claim will receive . . . regular installment payments in cash - (i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim; (ii) over a period ending not later than 5 years after the date of the order for relief . . . and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan . . . .

11 U.S.C. § 1129(a)(9)(C).

As to secured priority tax claims, Bankruptcy Code Section 1129(a)(9)(D) states that claimholders will receive cash payments "in the same manner and over the same period" as required for unsecured priority tax claims. 11 U.S.C. § 1129(a)(9)(D).

Here, the Plan states that holders of allowed priority tax claims shall receive cash equal to the unpaid [*36] portion of the claim, on the Plan's effective date or the distribution date following the date on which the priority tax claim becomes an allowed claim. Since the Plan provides that the priority tax claim holders will have their claims satisfied in full on the effective date, the Debtor has established by a preponderance of the evidence that the Plan meets the requirements set forth in Sections 1129(a)(9)(C) and (D).

### Bankruptcy Code Section 1129(a)(10)

Bankruptcy Code Section 1129(a)(10) requires that "at least one class of claims that is impaired under the plan has accepted the plan . . . without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). According to the Certification of Votes, impaired Classes 4, 5, and 6, which do not include insiders, have voted to accept the Plan. Accordingly, the Debtor has established by a preponderance of the evidence that the Plan satisfies the requirements of Section 1129(a)(10).

### Bankruptcy Code Section 1129(a)(11)

Bankruptcy Code Section 1129(a)(11) is commonly referred to as the "feasibility" requirement. The Bankruptcy Code requires that confirmation may proceed only if "[c]onfirmation of the plan is not likely to be followed [*37] by the liquidation, or the need for further financial reorganization, of the debtor . . . unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). The Second Circuit has interpreted the feasibility standard to mean "whether the plan offers a reasonable assurance of success. Success need not be guaranteed." *Kane v. Johns-Manville*, 843 F.2d at 649. *See In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 421-22 (Bankr. S.D.N.Y. 2003) (finding that "[i]n making determinations as to feasibility, . . . a bankruptcy court does not need to know to a certainty, or even a substantial probability, that the plan will succeed. All it needs to know is that the plan has a reasonable likelihood of success."). Bankruptcy courts consider factors including "the earning power of the business, its capital structure, the economic conditions of the business, the continuation of present management, and the efficiency of management in control of the business after confirmation" when assessing whether a plan is feasible. *In re D&G Invs. of West Fla., Inc.*, 342 B.R. 882, 886 (Bankr. M.D. Fla. 2006). *See Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d 581, 589 (6th Cir. 1986) [*38] (listing six factors relevant to determining feasibility).

In determining if a plan is feasible, the "inquiry is peculiarly fact intensive and requires a case by case analysis, using as a backdrop the relatively low parameters articulated in the statute." *In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 833 (Bankr. E.D. Pa. 1995). "A 'relatively low threshold of proof' will satisfy the feasibility requirement." *Mercury Capital*, 354 B.R. at 9 (quoting *Computer Task Grp., Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 191 (9th Cir. 2003)). And as the Second Circuit recently observed, "[i]n most situations, the time immediately following bankruptcy will call for fairly specific proof of the company's ability to meet its obligations . . . . As one moves further away from the time of confirmation, . . . the proof will necessarily become less and less specific." *Dish Network Corp. v. DBSD N. Am. Inc. (In re DBSD N. Am. Inc.)*, 2010 U.S. App. LEXIS 27007, 2011 WL 350480, at *22 (2d Cir. Feb. 7, 2011).

WFF argues that the Plan is not feasible because it hinges on speculative future sales of condominium units.

WFF also argues that based on the cramdown interest rate of 11.68 percent necessary to treat its claim fairly and equitably, [*39] as indicated by WFF's expert Mr. Bruck, the Plan will fail within the first year. This is because, based on the earlier plan projections, the Property's projected rental income for the first year is $1,112,443, which is significantly less than the $2,403,160 interest payment that would be due to WFF. [2] And WFF notes that it is unlikely that this shortfall can be cured, since the Managing Member testified that he is uncertain whether he or anyone else will contribute additional funds to the Debtor. Viewed another way, WFF argues that the Plan is not feasible using *any* interest rate higher than approximately 5.4 percent, even if WFF receives all of the net proceeds from condominium units sales because, as WFF's principal Mr. Heiden testified, at a 5.4 percent interest rate, there would remain an unpaid balance due to WFF of approximately $500,000 to $600,000 after five years.

> 2    As discussed above, after the evidentiary record was closed, the Debtor filed a fourth modified Plan and new Projections, and that Plan is the subject of this decision. These Projections indicate that the Debtor will sell a total of 27 condominium units earlier in the Plan and as a result, the interest payments [*40] owed to WFF would be slightly less than previously calculated. But the projected rental income in the first year would still be significantly less than the interest payments due to be made in that year, and the Plan would still fail in the first year.

The Debtor asserts that based on the Projections, the Plan is feasible in accordance with Section 1129(a)(11). The Debtor argues that the Projections are reliable and reasonable because they were prepared with management's input and independently validated by J.H. Cohn LLP. Moreover, the Projections are based on condominium unit sales that are not speculative. Rather, "the Projections rely on conservative sale and cash flow projections derived from financial reality, based upon reasonable assumptions consistent with the [DiGeronimo] Appraisal, the [Blake & Iaccio] Appraisal and WFF's Loan Extension Book . . . ." Debtor Reply at 42-43. The Debtor notes that WFF's own appraiser supports the feasibility of the Plan and the Projections by estimating that after leasing the unsold condominium units for one more year, the market could absorb the 37 unsold units in 18 months. The Projections clearly "show that the Debtor

will have sufficient funds [*41] to administer and consummate the Plan" while providing WFF with 4.75 percent interest. Debtor Reply at 45.

In the context of Section 1129(a)(11) and feasibility, the question to be addressed is not whether the Plan offers adequate treatment of WFF's claim. Rather, it is whether the Plan, *as proposed*, has a reasonable prospect of success. Viewed another way, this Section requires a debtor to show that it can accomplish what it proposes to do, in the time period allowed, on the terms set forth in the plan. And a finding that a plan is feasible does not mean that it satisfies the other requirements of confirmation, including the requirement to treat the claims of dissenting creditors fairly and equitably. Nor does it mean the risk that the reorganization may fail should not be taken into account in other ways, including in determining a cramdown interest rate.

The Projections indicate that the Debtor will have a positive cash flow during the five-year term of the Plan, with 95 percent of the net proceeds from the sale of condominium units being paid to WFF. The remaining five percent of net proceeds will be used towards the payment of the unsecured claims, the secured mechanic liens, and, [*42] in year five, the final payment to WFF.

While the sale of condominium units is not required by the Plan, the Debtor proposes to fund the Plan through the sale of condominium units over a five-year sellout period. The Debtor's five-year Projections in support of the Plan, as modified by the Debtor's post-hearing amendment to the Plan, call for one condominium unit to be sold in year one, four units in year two, six units in year three, seven units in year four, and nine units in year five.

The testimony of the Debtor's expert Mr. DiGeronimo supports the feasibility of the Debtor's projected condominium unit sales to fund the Plan. In particular, Mr. DiGeronimo testified that in view of "the cloud of the bankruptcy" and the potential difficulties a buyer may face in obtaining financing to purchase a unit in a "fractured condo," it would be "very difficult to sell any units until a plan of reorganization is approved." Oct. 6 Tr. at 86:9-20. Accordingly, Mr. DiGeronimo based his appraisal on a five-year sellout period, beginning with a year of no condominium unit sales, followed by a "sellout of approximately two units per quarter [which] then accelerated . . . to three units per quarter [*43] in the later quarters, over a five-year period." Oct. 6 Tr. at

94:22-25. Therefore, based on Mr. DiGeronimo's appraisal, the Debtor can sell all 37 unsold units over the five-year duration of the Plan, at a faster rate than anticipated by the Projections.

The testimony of WFF's expert Mr. Iaccio is also consistent with the feasibility of the Debtor's projected condominium unit sales. Mr. Iaccio bases his appraisal of the Property on a two and a half year absorption period for the 37 unsold condominium units, commencing one year after the Plan's effective date. Mr. Iaccio's appraisal projects that in the second year of the sellout period, the Debtor can sell 24 condominium units, and in the following six months, the remaining twelve units can be sold. That is, Mr. Iaccio based his appraisal of the Property on an assumption that the unsold condominium units can be sold, beginning one year after the Plan's effective date, at a significantly more rapid rate than the rate reflected in the assumptions underlying Mr. DiGeronimo's appraisal and the Debtor's Projections in support of the Plan.

Mr. Iaccio further testified that a prudent investor would sell the condominium units as expeditiously [*44] as possible. He indicated that the Williamsburg real estate market can absorb the sale of two condominium units per month:

> Q: Do you know how many sales of condo units have occurred in the last twelve months in the Williamsburg area?
> A: Approximately, yes. In the past ten months of this year there have been about 440 condo units conveyed. In prior years, in 2008 and 2009 the average was about 550 a year. So we're basically still on track for that amount.
>
> . . .
>
> Q: Mr. Iaccio, do you believe that the Williamsburg market will be able to absorb an additional twenty-five units as contemplated in your [first] sellout period?
> A: I do, and we don't necessarily consider them as additional; they're part of the inventory and they're just being brought to the market at that point in time.
> Q: And do you believe that the Williamsburg market will be able to absorb an additional twelve units that you

contemplate will be sold in the remaining
six-month period in your appraisal?
    A: Yes, and again, that works out to two
units per month.

Nov. 18 Trial Tr. at 15:6-11; 16:24-17:9.

Both the Iaccio and DiGeronimo appraisals note a
three percent growth rate, which is offset by the discount
rate or an "internal rate [*45] of return . . . [which]
reflects time, value, money, risk and profit." Oct. 6 Trial
Tr. at 98:6-9. *See* Nov. 18 Trial Tr. at 18:19-25. Mr.
Iaccio estimated that selling the condominium units over
a five-year period, versus over two and a half years,
would result in approximately $1.4 million in additional
income. Yet, Mr. Iaccio asserts that the additional
revenue is not worth the risk associated with holding the
remaining condominium units for an additional two and
half years.

    Q: So in your view, is that a risk worth
taking?
    A: No.
    Q: Why not?
    A: Because you're gaining five percent
of the total sellout . . . but the risk of
holding it for two and a half years, the
unknown, is a bigger risk to gain only five
percent in total present value return. Not
worth it.

Dec. 1 Trial Tr. at 53:9-15.

Here, the Projections indicate that the Debtor will
have sufficient excess net cash flow to pay WFF's claim
at the 4.75 percent interest rate proposed in the fourth
modified Plan. Both the DiGeronimo and Iaccio
appraisals reflect their expert assumption that the
Williamsburg real estate market can absorb the proposed
condominium unit sales as set forth in the Projections. In
fact, WFF's own appraiser stated [*46] that there is a
market for the condominium units in Williamsburg and
recommended selling the remaining units faster than
proposed by both the DiGeronimo appraisal and the
Debtor.

For these reasons, and based on the entire record, the
Debtor has established by a preponderance of the
evidence that the Plan is feasible and that the
requirements of Section 1129(a)(11) are satisfied.

*Bankruptcy Code Section 1129(a)(12)*

Bankruptcy Code Section 1129(a)(12) requires that
"[a]ll fees payable under section 1930 of title 28, as
determined by the court at the hearing on confirmation of
the plan, have been paid or the plan provides for the
payment of all such fees on the effective date of the
plan." 11 U.S.C. § 1129(a)(12). Here, the Plan states that
"all fees payable under 28 U.S.C. § 1930 that have not
been paid, shall be paid on or before the Effective Date."
Plan Art. II(B). Accordingly, the Debtor has established
by a preponderance of the evidence that the Plan meets
the requirements of Section 1129(a)(12).

*Bankruptcy Code Section 1129(a)(13)*

Bankruptcy Code Section 1129(a)(13) requires that a
plan provide for "the continuation of payment of all
retiree benefits, at the level established pursuant [*47] to
section 1114 of the Bankruptcy Code at any time prior to
confirmation of the plan, for the duration of the period
the debtor has obligated itself to provide such benefits."
*PC Liquidation*, 2006 Bankr. LEXIS 4638, at *27.
Therefore, to comply with Section 1129(a)(13), a plan
must allow for the continued payment of retirement
benefits either at "(1) the level originally provided by the
debtor . . . or (2) at the modified level established
pursuant to the requirements of section 1114 of the
Bankruptcy Code by court order, or by agreement
between the debtor in possession or trustee and the
authorized representative of the persons entitled to
receive retiree benefits." 7 COLLIER ON BANKRUPTCY ¶
1129.02[13] at 1129-56 (Alan N. Resnick & Henry J.
Sommer eds., 16th ed. 2010).

Here, Article VI(D) of the Plan states that "[t]he
Debtor has no retirement benefit agreements with past or
current employees." Plan Art. VI(D). As a result, Section
1129(a)(13) does not apply to this case.

*Bankruptcy Code Section 1129(d)*

Bankruptcy Code Section 1129(d) requires that "on
request of a governmental unit, the court may not confirm
a plan if its principal purpose is the avoidance of taxes or
the avoidance [*48] of the application of section 5 of the
Securities Act of 1933, as amended." *PC Liquidation*,
2006 Bankr. LEXIS 4638, at *28. There has been no
request under this Section or objection to the Plan by any
governmental unit on these grounds. Accordingly,
Section 1129(d) does not apply to this case.

*The Cramdown Requirements*

The cramdown requirements under Bankruptcy Code Section 1129(b) present the most significant obstacle to the Debtor in connection with the confirmation of the Plan. Section 1129(b)(1) provides that if the requirements of Section 1129(a) are satisfied, but the plan has not been accepted in accordance with Section 1129(a)(8), then "the court, on request of the proponent of the plan, shall confirm the plan . . . if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). *See Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441, 119 S. Ct. 1411, 143 L. Ed. 2d 607 (1999) (noting that the "objection of an impaired creditor class may be overridden only if 'the plan does not discriminate unfairly, and is fair and equitable, with respect to [*49] each class of claims or interests that is impaired under, and has not accepted, the plan'") (quoting 11 U.S.C. § 1129(b)(1)). This Court will address each of these cramdown elements in turn.

Unfair Discrimination The Bankruptcy Code does not set forth a standard to determine whether a plan discriminates unfairly in a cramdown scenario. Courts agree that the purpose underlying this requirement is to "ensure[ ] that a dissenting class will receive value equal to the value given to all other similarly situated classes." *In re Johns-Manville*, 68 B.R. at 636. *See In re Young Broad. Inc.*, 430 B.R. 99, 139-40 (Bankr. S.D.N.Y. 2010) (stating that "[u]nder 1129(b)(1), a plan unfairly discriminates when it treats similarly situated classes differently without a reasonable basis for the disparate treatment").

Here, Class 2, which is comprised solely of WFF's claim, is the only impaired class to vote against confirmation of the Plan. And there is no other class of claims or interests that is similarly situated to WFF's Class 2. Accordingly, the Debtor has established by a preponderance of the evidence that the Plan does not discriminate unfairly against WFF's claim.

Fair and Equitable Bankruptcy Code Section 1129(b)(2) [*50] sets forth the requirements to treat a dissenting impaired class fairly and equitably. These requirements establish a floor, and satisfaction of these statutory requirements does not guarantee that the plan will meet the fair and equitable standard. As one court observed:

A plan which does not meet the standards set forth in § 1129(b)(2) cannot be "fair and equitable." However, technical compliance with all the requirements in § 1129(b)(2) does not ensure that a plan is "fair and equitable". . . . Section 1129(b)(2) sets minimal standards plans must meet.

*In re Matter of D&F Constr. Co.*, 865 F.2d 673, 675 (5th Cir. 1989) (internal citations omitted). *See In re N. Outer Banks Assocs.*, 2010 Bankr. LEXIS 3974, 2010 WL 4630348, at *8 (Bankr. E.D.N.C. Nov. 8, 2010) (observing that "[e]ven if a plan meets the standards of 11 U.S.C. § 1129(b)(2), it can still be considered not 'fair and equitable' and therefore, nonconfirmable"); *In re Cellular Info. Sys.*, 171 B.R. 926, 937 (Bankr. S.D.N.Y. 1994) (noting that "[a]t [*51] minimum, a fully secured creditor is treated fairly and equitably if it retains the lien securing its claim and receives deferred cash payments which have a present value equal to the amount of its claim").

Here, the Debtor seeks to treat WFF's claim fairly and equitably under the standard set forth in Section 1129(b)(2)(A)(i). This Section states that a plan is fair and equitable as to a dissenting class of secured claims if the plan provides:

(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

11 U.S.C. § 1129(b)(2)(A)(i).

*Whether WFF retains its liens on its pre-petition collateral*

The first element of the fair and equitable standard

requires that WFF retain the pre-petition liens securing its claim. Article III(A)(2)(b)(i) [*52] of the Plan provides that WFF retains its liens on the 37 unsold condominium units and parking spaces at the Property, along with the related rents and leases. WFF also receives a new lien on storage units located at the Property. And the Plan provides that WFF retains its lien on the Equity Holders' membership interest in the Debtor as provided by the Pledge Agreement. As a result, the Debtor has established by a preponderance of the evidence that WFF retains its liens on its pre-petition collateral as required by Section 1129(b)(2)(A)(i)(I).

*Whether WFF receives the present value of its claim*

The second element of the fair and equitable standard requires that WFF receive deferred cash payments equal to the present value of its allowed claim under the Plan. 11 U.S.C. § 1129(b)(2)(A)(i)(II). As the Supreme Court noted, "a creditor receives the 'present value' of its claim only if the total amount of the deferred payments includes the amount of the underlying claim plus an appropriate amount of interest to compensate the creditor for the decreased value of the claim caused by the delayed payments." *Rake v. Wade*, 508 U.S. 464, 472 n.8, 113 S. Ct. 2187, 124 L. Ed. 2d 424 (1993). *See Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns)*, 547 F.3d 763, 768-69 (7th Cir. 2008) [*53] (finding that a claim that is paid over time pursuant to Section 1129(b)(2)(A)(i)(II) requires the payment of interest).

Many courts look to the U.S. Supreme Court's Chapter 13 decision in *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S. Ct. 1951, 158 L. Ed. 2d 787 (2004), for guidance in determining the appropriate interest rate in a Chapter 11 cramdown case. In *Till*, the Chapter 13 debtors purchased a truck from Instant Auto Finance. *Till*, 541 U.S. at 469. They financed the purchase with a secured retail installment contract with a 21 percent interest rate, and Instant Auto Finance promptly assigned that contract to SCS Credit Corporation ("SCS"). *Till*, 541 U.S. at 470.

In their Chapter 13 plan, the debtors proposed to pay 9.5 percent interest to SCS on the secured portion of its claim. *Till*, 541 U.S. at 471. The debtors derived this interest rate using the "prime-plus" or "formula rate" approach, beginning with the national prime rate of eight percent, and adding 1.5 percent to account for the risk of non-payment of the loan. *Id.*

SCS objected to confirmation of the plan, arguing that 21 percent was the appropriate interest rate because that was the rate it would have received if it had foreclosed on the truck and reinvested [*54] the proceeds in loans of similar duration and risk. *Till*, 541 U.S. at 470-71.

The Supreme Court noted three considerations when evaluating different approaches, including the "coerced loan," "presumptive contract rate," "cost of funds," [3] and "formula" approaches, to determine the appropriate interest rate for a Chapter 13 plan. First, the Court stated that Congress "would favor an approach that is familiar in the financial community and that minimizes the need for expensive evidentiary proceedings." *Till*, 541 U.S. at 474-75. Second, the Court observed that "the court's authority to modify the number, timing, or amount of the installment payments from those set forth in the debtor's original contract is perfectly clear." *Till*, 541 U.S. at 475. That is, the Court confirmed that a bankruptcy court may account for other circumstances including the risk of default. Finally, the Court observed that "from the point of view of a creditor, the cramdown provision mandates an objective rather than a subjective inquiry." *Till*, 541 U.S. at 476. Consequently, a court "need not consider the creditor's individual circumstances, such as its prebankruptcy dealings with the debtor or the alternative [*55] loans it could make if permitted to foreclose." *Till*, 541 U.S. at 476-77.

3  The "coerced loan rate" is "the rate the creditor could obtain if it were permitted to foreclose and reinvest the proceeds in equivalent loans." Gerald F. Munitz, *The Chapter 11 Plan: Proposal, Confirmation and Effect of Confirmation*, 870 PLI/COMMERCIAL LAW AND PRACTICE COURSE HANDBOOK SERIES 515, 544 (Nov.-Dec. 2004). The "presumptive [contract] rate" looks to "the prepetition contract rate, subject to adjustment up or down based upon the particular facts of the case." *Id.* Finally, the "cost of funds rate" is the "cost the creditor would incur to obtain the cash equivalent of the collateral (i.e. the interest rate the creditor would have to pay on a loan in an amount equal to the value of the collateral)." *Id. See In re Prussia Assocs.*, 322 B.R. 572, 587 n.12 (Bankr. E.D. Pa. 2005).

The Supreme Court concluded that defects were present in all but the formula approach. In rejecting the

coerced loan, presumptive contract rate, and cost of funds approaches, the Supreme Court noted that "[e]ach of these approaches is complicated, imposes significant evidentiary costs, and aims to make each individual creditor whole [*56] rather than to ensure the debtor's payments have the required present value." *Till*, 541 U.S. at 477. By contrast, the "formula approach entails a straightforward, familiar, and objective inquiry, and minimizes the need for potentially costly additional evidentiary proceedings." *Till*, 541 U.S. at 479. The formula approach uses the national prime rate, which is reported daily in the press, and adds an appropriate risk adjustment. [4] This is "[b]ecause bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers." *Id.* The Court noted that factors such as "the circumstances of the estate, the nature of the security and the duration and feasibility of the reorganization plan" are considerations in determining the size of the risk adjustment. *Id.*

> 4 Prior to *Till*, the Second Circuit in *General Motors Acceptance Corp. v. Valenti (In re Valenti)*, 105 F.3d 55 (2d Cir. 1997), applied a similar formula approach to determine the cramdown interest rate in a Chapter 13 case. The court held that the interest rate should be determined by combining "the rate on a United States Treasury instrument" with "a [risk] premium to reflect the risk to the creditor in receiving [*57] deferred payments under the reorganization plan." *Valenti*, 105 F.3d at 64. *See Till*, 541 U.S. at 504, 506 (citing *Valenti*, 105 F.3d at 64).

The Supreme Court did not directly address the question of whether the formula approach should apply outside of the Chapter 13 context. The Court stated that it is "likely that Congress intended bankruptcy judges and trustees to follow essentially the same approach when choosing an appropriate interest rate under any . . . [cramdown] provision[]." *Till*, 541 U.S. at 474. At the same time, the Court contrasted Chapter 13, where there may be no discernible market interest rate for cramdown loans, and Chapter 11, where there may be lenders that will provide financing. As the Court explained, in Chapter 13 "every cramdown loan is imposed by a court over the objection of the secured creditor, [so] there is no free market of willing cramdown lenders." *Till*, 541 U.S. at 476 n.14. As a result, the Court observed, "when picking a cramdown rate in a Chapter 11 case, it might

make sense to ask what rate an efficient market would produce." *Id.*

In *Bank of Montreal v. Official Committee of Unsecured Creditors (In re American HomePatient, Inc.)*, 420 F.3d 559 (6th Cir. 2005), [*58] the Sixth Circuit "decline[d] to blindly adopt *Till's* . . . formula approach for Chapter 13 cases in the Chapter 11 context." *Am. HomePatient*, 420 F.3d at 568. Rather, the court found that in a Chapter 11 case, if an efficient market exists then the market interest rate should apply, but if there is no efficient market then *Till's* formula approach should be used. *Id.* The court rejected the lenders' argument that a blended interest rate was appropriate, reasoning that this approach was "centered on the composite interest rate that a new loan (including 'mezzanine' debt and equity) would command in the market, not what their loan to [the debtor] (which was all senior debt) would require." *Id.* And the court noted that the lenders' proposed blended interest rate of 12.16 percent was almost 8 percent more than the national prime rate, resulting in a windfall for the lender. *Am. HomePatient*, 420 F.3d at 569.

Courts in this Circuit have concluded that the two-step analysis described in *American HomePatient* is an appropriate way to determine the interest rate that should apply in a Chapter 11 cramdown situation. For example, in *Mercury Capital Corp. v. Milford Connecticut Assocs.*, 354 B.R. 1 (D. Conn. 2006), [*59] the district court endorsed factors to determine the appropriate interest rate, including:

> (1) does an efficient market exists for the type of loan [the secured creditor] is forced to give the debtor under the competing plans; (2) if there is no efficient market rate and it is thus appropriate to apply the *Till* formula, what was the national prime rate on the relevant date . . .

*Mercury Capital*, 354 B.R. at 13.

And similarly, in *In re DBSD North America, Inc.*, 419 B.R. 179 (Bankr. S.D.N.Y. 2009), when considering what cramdown interest rate would provide a creditor with the indubitable equivalent of its claim under Section 1129(b)(2)(A)(iii), the bankruptcy court was guided by Second Circuit case law pertaining to cramdown under

Section 1129(b)(2)(A)(i). The court observed that a market interest rate should be used as a benchmark when a market exists for a loan to a Chapter 11 debtor:

> In determining the appropriateness of a proposed cramdown interest rate, courts in this district have looked to the market interest rate for loans with similar terms. Still other courts have considered the prepetition contract rate in determining whether the cramdown interest rate is sufficient. There is [*60] other arguably relevant law, under chapter 13 of the Bankruptcy Code, but I consider reliance on these two bases to be preferable.

*In re DBSD N. Am.*, 419 B.R. at 209, *aff'd sub nom. Sprint Nextel Corp. v. DBSD N. Am. Inc.*, 2010 U.S. Dist. LEXIS 33253, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part sub nom. Dish Network Corp. v. DBSD N. Am. Inc.*, 2010 U.S. App. LEXIS 27007, 2011 WL 350480 (2d Cir. Feb. 7, 2011). The bankruptcy court's decision was later affirmed by the district court, and affirmed in part and reversed in part by the Second Circuit on grounds unrelated to the bankruptcy court's cramdown interest rate analysis. *Dish Network Corp. v. DBSD N. Am. Inc.*, 2010 U.S. App. LEXIS 27007, 2011 WL 350480, at *1, *12 (2d Cir. Feb. 7, 2011); *Sprint Nextel Corp. v. DBSD N. Am. Inc.*, 2010 U.S. Dist. LEXIS 33253, 2010 WL 1223109, at *5 (S.D.N.Y. Mar. 24, 2010).

The majority of courts outside this Circuit to consider the issue have similarly applied the two-step analysis described by the Sixth Circuit in *American HomePatient* to determine the appropriate cramdown interest rate in a Chapter 11 plan. *See, e.g., Gen. Elec. Credit Equities, Inc. v. Brice Rd. Devs., L.L.C. (In re Brice Rd. Devs., L.L.C.)*, 392 B.R. 274, 280 (B.A.P. 6th Cir. 2008) (finding that "in a chapter 11 case where [*61] an 'efficient market' exists, the market rate should be applied, and where no 'efficient market' exists, the formula approach endorsed by the Supreme Court in [*Till*]. . . should be employed"); *SPCP Grp., LLC v. Cypress Creek Assisted Living Residence Inc.*, 434 B.R. 650, 660 (M.D. Fla. 2010) (affirming the bankruptcy court's finding that "no efficient market existed" and the application of the *Till* formula approach to determine the cramdown interest rate); *Interim Capital, LLC v. Hank's Dock, Inc. (In re Seaspan Dev. Corp.)*, 2006 U.S. Dist.

LEXIS 66827, 2006 WL 2672298, at *2-3 (E.D. Tenn. Sept. 18, 2006) (affirming the four percent interest rate under the plan of reorganization because the bankruptcy court's rationale closely mirrors the framework set by the Sixth Circuit in *American HomePatient); In re L.B. Bryant*, 439 B.R. 724, 742 (Bankr. E.D. Ark. 2010) (adopting the two-step approach set forth in *American HomePatient); In re Bashas' Inc.*, 437 B.R. 874, 920 (Bankr. D. Ariz. 2010) (observing that "[f]or at least the last 20 years, the Ninth Circuit Court of Appeals has instructed the bankruptcy courts to assess, and whenever possible use a 'formula approach,' and consider the 'risks associated with a given [*62] debtor and the security associated with a specific debt'"); *In re Nw. Timberline Enters.*, 348 B.R. 412, 432, 435 (Bankr. N.D. Tex. 2006) (concluding that in the absence of an "'efficient market' of lenders willing to provide an exit loan identical to what is being offered" under the plan, the *Till* formula approach should be used); *In re Cantwell*, 336 B.R. 688, 693 (Bankr. D.N.J. 2006) (finding that where there is "no evidence produced to establish that an 'efficient market' exists," the *Till* formula approach applies); *In re Deep River Warehouse, Inc.*, 2005 Bankr. LEXIS 1793, 2005 WL 2319201, at *11 (Bankr. M.D.N.C. Sept. 22, 2005) (determining that "the formula approach is the best approach, under the facts and circumstances of this case"); *In re Prussia Assocs.*, 322 B.R. 572, 588-89, 604 (Bankr. E.D. Pa. 2005) (concluding "that adherence to the formula approach articulated in *Till* remains the most appropriate course to follow herein"). *See* Gary W. Marsh & Matthew M. Weiss, *Chapter 11 Interest Rates After Till*, 84 Am. Bankr. L.J. 209, 213 (2010).

This Court will follow the majority approach and consider first whether there is a market for the loan proposed in the Plan. If there is no such market, then the [*63] Court will consider next whether the interest rate proposed by the Plan applies an appropriate risk adjustment to the national prime rate in accordance with the *Till* formula approach.

### *Whether there is a market for the loan proposed in the Plan*

To determine whether there is a market for the loan at issue, most courts look to expert evidence and evidence of actual loan offers. *See, e.g., Deep River Warehouse*, 2005 Bankr. LEXIS 1793, 2005 WL 2319201, at *12. As one court observed before *Till*, consideration should be given to the "current market rates" for loans that are

"similar in term, quality of security, and risk of repayment or financial condition of the borrower." *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 706 (Bankr. S.D.N.Y. 1993). As another court noted:

> The interest rate under an original loan agreement is informative as to a proposed cramdown interest rate's merits to the extent the original rate was set near in time to a debtor's chapter 11 proceeding and in a period in which market conditions were substantially similar to present conditions.

*In re Cellular Info. Sys. Inc.*, 171 B.R. 926, 938 (Bankr. S.D.N.Y. 1994).

Other courts have looked to tiered financing to determine whether a [*64] market interest rate exists. The tiered financing or band of investment approach calls for the court to consider whether the debtor can obtain a loan through a combination of different tranches of financing. The interest rates of these tranches are then blended to determine the appropriate rate. *See, e.g., Pac. First Bank v. Boulders on the River, Inc. (In re Boulders on the River, Inc.)*, 164 B.R. 99, 102-03, 107 (B.A.P. 9th Cir. 1994) (affirming the bankruptcy court decision applying a blended interest rate of nine percent); *In re N. Valley Mall, LLC*, 432 B.R. 825, 832-36 (Bankr. C.D. Cal. 2010) (applying a blended interest rate of 8.5 percent); *In re Cellular Info. Sys.*, 171 B.R. at 944 (applying the band of investment approach and denying confirmation because the plan's cramdown interest rate was lower than the blended rate).

The Debtor offered the expert testimony of Paul Fried, an experienced real estate finance professional, on the question of whether there is a market for the loan proposed in the Plan. Mr. Fried stated that there is "no efficient market for loans on bulk, unsold condominium units with the characteristics of the Collateral and WFF's . . . claim." Debtor Exh. 12 [*65] ¶ 37. Mr. Fried contacted several real estate lenders to see if any would be interested in financing a loan similar to the one provided under the Plan. None of the lenders indicated an interest in making a "traditional" loan on assets similar to WFF's collateral. As Mr. Fried reported, "most of the contacted lenders were out of the real estate lending market altogether." Debtor Exh. 12 ¶ 36. Accordingly, Mr. Fried opined that there is no market for the loan

provided under the Plan.

WFF offered the expert testimony of Stuart Bruck, also an experienced real estate finance professional, in support of its position that there is a market for a loan akin to the one proposed in the Plan. To reach that conclusion, he proposed a three-tiered structure including a loan secured by a first mortgage, a mezzanine loan secured by a second mortgage, and an equity investment. Specifically, Mr. Bruck found that there is an efficient market for a loan of $13.65 million secured by a first mortgage with a 65 percent loan-to-value ratio at a 7.5 percent interest rate, a mezzanine loan of $3.15 million secured by a second mortgage with an aggregate 80 percent loan-to-value ratio at a 13.5 percent interest [*66] rate, and an equity investment of $3,628,682. He also estimated a rate of return on the equity investment of 22 percent. Based on this structure, Mr. Bruck calculated a blended rate of return to derive an 11.68 percent interest rate, and concluded that this is the appropriate rate for WFF to receive under the Plan.

Here, the record shows that there is not a market for the loan proposed in the Plan. That is, as the Debtor's expert Mr. Fried stated, an efficient market does not exist for a loan of this size secured by collateral of this nature in the full amount of the value of the Property. This testimony was grounded in his years of experience in real estate finance as well as his inquiries to prospective lenders. Those inquiries indicate that participants in the loan market were not willing to make a loan of the nature proposed in the Plan.

The expert evidence advanced by WFF is consistent with this conclusion. WFF's expert Mr. Bruck acknowledged that it would be extremely difficult to obtain a loan in the present market for the full amount of the Property's value. He stated that there is no efficient market for a loan on the terms presented in the Plan:

> Q: Mr. Bruck there is no traditional [*67] financing available for this project at 20.5 million, correct?
>
> A: At 20.5 million, no.
>
> Q: And there is no efficient market for [a] loan on this project of 20.5 million payable over five years?
>
> A: No.
>
> Q: In fact, Mr. Bruck, when you turn to nontraditional, private or hard money

lending in your opinion it would be difficult to obtain a loan even from a private or hard money lender at that amount, is that correct?

A: If you're referring to a hundred percent loan-to-value ratio, yes.

Dec. 2 Trial Tr. at 33:25-34:11. And Mr. Bruck's three-tiered structure includes an equity contribution, reducing the total leverage to 80 percent.

Mr. Bruck also explained why a fully leveraged property contributes significantly to the risk associated with a loan, and is the "foremost" reason why there are no conventional loans available for the Property:

Q: Mr. Bruck, why are there no conventional loans for this property at twenty and a half million - 20,500,000 dollars?

A: Well foremost is the . . . hundred percent loan-to-value but there are other risks associated with this debt.

Q: When you say, I think you said primary is the loan-to-value, why is that an issue?

A: Well at a hundred percent loan-to-value there's [*68] no margin of error for a lender if . . . value were to decrease, you know, there's no more equity in the building. So at a hundred percent loan-to-value the borrower has no equity and there's no margin of error left.

Q: And how does that no margin of error equate with an interest rate?

A: Well as a hundred percent loan-to-value it would equate you a substantial premium on any rate, if available.

Dec. 2 Trial Tr. at 35:24-36:14.

The absence of a market for the loan described in the Plan is also consistent with the loan term sheets offered by WFF. These terms sheets were procured from several banks and reflect terms for loans on property located in Manhattan. But the loans described in those term sheets are different from the loan proposed in the Plan in several significant respects. For example, the principal amount of the loans proposed ranges from $3 million to $13 million,

far less than the $20.5 million loan under the Plan. And each of these term sheets describes a prospective loan with total debt of 60 percent to 75 percent of the value of the subject property, so that a significant equity cushion would remain to protect the lender. Here, by contrast, the contemplated leverage is 100 [*69] percent.

For these reasons, and based on the entire record, the Debtor has established by a preponderance of the evidence that there is not a market for the loan proposed in the Plan.

*Whether the Plan proposes an appropriate risk adjustment*

In the absence of a market for the loan proposed in the Plan, the Court must consider whether the cramdown interest rate proposed in the Plan includes an appropriate risk adjustment. Since there is no applicable market interest rate, it is appropriate to consider the formula approach set forth in *Till*. This approach provides that the cramdown interest rate may be determined by adjusting the national prime rate to reflect the amount of risk associated with the loan at issue. The appropriate risk adjustment is determined by considering factors including "the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Till*, 541 U.S. at 479.

Additional "risk factors to consider include the debt service coverage ratio, the loan-to-value ratio, and the quality of any guarantors." *In re Griswold Bldg. LLC*, 420 B.R. 666, 693 (Bankr. E.D. Mich. 2009). *See In re Gramercy Twins Assocs.*, 187 B.R. 112, 124 (Bankr. S.D.N.Y. 1995) [*70] (noting that "the relatively high loan to value ratio in this case, which is approximately 85%, increases the risk factor"); *Deep River Warehouse*, 2005 Bankr. LEXIS 1793, 2005 WL 2319201, at *11 (observing that "[r]isk is increased significantly when the loan to value ratio is 100%, but a high grade tenant positively affects that risk").

In *Till*, the Supreme Court noted that courts generally grant a one to three percent risk adjustment when applying the formula approach. *Till*, 541 U.S. at 480. Courts have also applied significantly higher risk adjustments to reflect the particular circumstances of a case. *See, e.g., In re Griswold Bldg. LLC*, 420 B.R. at 696 (applying a five percent risk adjustment); *In re Nw. Timberline Enters.*, 348 B.R. at 434 (determining there was "no 'efficient market' of lenders willing to provide an

exit loan identical to what is being offered to [the secured lender] here," and concluding that a 5.75 percent risk adjustment was appropriate).

The Debtor's expert Mr. Fried analyzed the appraisals, the Debtor's rent roll, the projections, and other information provided by the Debtor's professional advisors in order to determine the appropriate risk adjustment. Based on this review, Mr. Fried [*71] found that the Plan has a strong likelihood of success, and that the only "foreseeable 'risk' to WFF is the cost of pursuing its remedies and liquidating its Collateral." Debtor Exh. 12 ¶ 35.

To account for this risk, Mr. Fried recommended a 0.65 percent risk adjustment. Mr. Fried concluded that together with the 3.25 percent prime rate, a 3.9 percent interest payment would provide WFF with a "war chest" of approximately $500,000 to pay for its litigation expenses if the Plan should fail. Debtor Exh. 12 ¶ 35.

In the fourth modified Plan, which was filed after the evidentiary record was closed, the Debtor increases the risk adjustment to 1.5 percent and the interest payment to WFF to 4.75 percent. The Debtor argues that there is little risk associated with the Plan, so that the 1.5 percent risk premium reflected in the Plan adequately compensates WFF for the present value of its allowed claim.

WFF argues that in the absence of a market, a 1.5 percent risk premium is not sufficient to compensate WFF for the risks associated with the Plan. WFF's interest rate expert Mr. Bruck identified several aspects of this risk, including the 100 percent loan-to-value ratio, the stigma of bankruptcy [*72] associated with the Property, the lack of Fannie Mae financing for potential buyers, and the oversupply of comparable properties in Williamsburg. Mr. Bruck testified that an eight to nine percent risk adjustment to the 3.25 percent prime rate would be appropriate to compensate WFF for these risks.

Here, there is greater risk associated with the Plan than the litigation costs that WFF will bear to pursue its legal remedies and liquidate its collateral if the Plan fails. Even if the only risk that WFF faces is the cost of enforcing its contract rights, and taking into account the Plan interest rate of 4.75 percent, WFF will receive the full benefit of the $500,000 "war chest" only after considerable time has passed. If the Debtor fails in its reorganization efforts at an earlier date, WFF will receive less.

And there are other significant risks that are not accounted for by a risk premium of 1.5 percent. If the Property is liquidated, WFF faces a significant risk that it will recover less than the amount that it is owed. This is shown by the fact that the loan proposed by the Plan is for the full amount of the Property's value, and leaves no equity cushion to WFF in the event that the [*73] value of the Property declines or the proceeds of a sale are less than expected. The proposed risk premium also does not provide a source of funds for the costs of a sale outside of the "war chest" for litigation expenses.

The risk of a diminished recovery if the Property is sold is also consistent with the Debtor's liquidation analysis as set forth in the Plan. The Debtor correctly notes that this analysis was prepared for a different purpose than considering the appropriate risk premium to be applied in determining the cramdown interest rate, and also observes that a prompt liquidation would not result in the highest return for the Property. But that does not make the analysis irrelevant. And the Debtor's liquidation analysis indicates that if the Property is liquidated, it would yield $16.2 million, resulting in a loss of $4.4 million to WFF.

Another consideration in determining the appropriate risk premium is the risk that the Debtor's reorganization, which is based on sales of condominium units over a five-year period, may not succeed. Threats to the success of the Debtor's reorganization include the lack of financing for potential purchasers of the condominium units and the lack [*74] of additional financial contributions from the Equity Holders. If the condominium units cannot be sold as set out in the Projections, the Debtor will require other sources of funds to meet its obligations. But the Equity Holders have not indicated a willingness to fund any shortfall, and the Debtor has not identified any alternative source of funds.

In sum, there are other risks associated with the Plan, in addition to the litigation costs that WFF would bear to pursue its legal remedies in the event that the Debtor's reorganization does not succeed and the Debtor defaults under the Plan. The record does not show that the Plan's 1.5 percent risk adjustment is adequate to account for the potential shortfall WFF would face in a liquidation scenario, the other risks associated with fully leveraged property without any equity cushion, and the risk of nonpayment under the Plan.

For these reasons, and based on the entire record, the Debtor has not established by a preponderance of the evidence that the Plan proposes an appropriate risk adjustment to the cramdown interest rate to be paid to WFF.

* * *

Confirmation of the Plan requires the Debtor to establish by a preponderance of the evidence [*75] that each of the confirmation requirements of Bankruptcy Code Section 1129 has been met. Here, the Debtor has not established by a preponderance of the evidence that the Plan is fair and equitable to WFF's claim, because it has not shown that WFF receives the present value of its claim by satisfying the cramdown requirement of Section 1129(b)(2)(A)(i)(II). Accordingly, confirmation of the Plan is denied.

## Conclusion

For the reasons stated herein, and based on the entire record, confirmation of the Plan is denied. An order in accordance with this Memorandum Decision shall be entered simultaneously herewith.

Dated: Brooklyn, New York

March 7, 2011

*/s/ Elizabeth S. Stong*

HONORABLE ELIZABETH S. STONG

UNITED STATES BANKRUPTCY JUDGE



LEXSEE 2009 BANKR. LEXIS 1724

**In re LOCO REALTY CORP., Debtor.**

**Chapter 11, Case No. 09-11785 (AJG)**

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2009 Bankr. LEXIS 1724**

**June 25, 2009, Decided**

**COUNSEL:** [*1] For Loco Realty Corp., Debtor: Rick A. Steinberg, Nowell Amoroso Klein Bierman, P.A., Hackensack, NJ.

**JUDGES:** Arthur J. Gonzalez, UNITED STATES BANKRUPTCY JUDGE.

**OPINION BY:** Arthur J. Gonzalez

**OPINION**

**OPINION AND ORDER REGARDING MOTION OF JPMORGAN CHASE BANK, N.A., AS SUCCESSOR TO WASHINGTON MUTUAL BANK, TO (1) DISMISS OR CONVERT CHAPTER 11 CASE UNDER 11 U.S.C. § 1112(b) OR (2) DISMISS, SUSPEND OR ABSTAIN FROM PRESIDING OVER CHAPTER 11 CASE UNDER 11 U.S.C. § 305(a)**

Before the Court is the motion of JPMorgan Chase Bank, N.A., as successor to Washington Mutual Bank (the "Bank"), to (1) dismiss or convert the Debtor's chapter 11 case pursuant to 11 U.S.C. § 1112(b); or in the alternative, (2) dismiss, suspend or abstain from presiding over the Debtor's chapter 11 case pursuant to 11 U.S.C. § 305(a).

FACTS

The Debtor is the owner of a 45-unit mixed-use apartment building located at 1645 Grand Avenue, Bronx, NY 10453 (the "Property"). On April 3, 2009, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor's petition provided that the nature of the business was "single asset real estate" as defined in 11 U.S.C. § 101(51B).

On May 18, 2007, the Bank made a $ 3,000,000 loan to [*2] the Debtor, which was secured by the Debtor with a promissory note and mortgage on the Property. Section 2.2 of the mortgage, entitled "Absolute Assignment," purported to absolutely and presently transfer all the Debtor's interests in the leases of the Property to the Bank. In addition, the Bank had the right under section 2.2(a) to collect all rents from the leases. Under section 2.2(b), the Debtor maintained a revocable license to collect and retain the rents but upon default, such license automatically terminated.

Around September 2008, the Debtor stopped making payments on its mortgage. Under the terms of the loan, all amounts owed by the Debtor became immediately due and payable upon default. As of January 1, 2009, the Debtor owed $ 3,219,075.49 in amounts past due. On January 13, 2009, the Bank initiated a foreclosure action in the Supreme Court, Bronx County. In the foreclosure action, the Bank made a motion for appointment of a receiver, which was granted by an order dated February 23, 2009. The receiver filed his oath with the state court on March 4, 2009 and filed his bond on March 9, 2009.

All proceedings in the state court foreclosure action were stayed by virtue of the Debtor's [*3] bankruptcy filing on April 3, 2009. As a result, the receiver did not take possession of the Property. On April 6, 2009, the Debtor filed a motion before the Court to use the Bank's cash collateral in the form of rents collected from tenants at the Property. On May 14, 2009, an interim order was entered permitting the Debtor to use cash collateral in the form of rents that may have been assigned to the Bank. (ECF Docket No. 39). This interim order was entered without making a determination of whether the rents were cash collateral or belonged to the Bank. [1] On May 8, 2009, the Debtor filed a plan of reorganization. (ECF Docket No. 34).

> 1   A second and third interim cash collateral order was subsequently entered. (ECF Docket Nos. 44 &48). Those orders are substantially the same as the first interim cash collateral order.

## DISCUSSION

The Bank moves to dismiss the Debtor's chapter 11 case pursuant to 11 U.S.C. § 1112(b)(1) for "cause." Section 1112(b)(1) provides

> [O]n request of a party in interest and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors [*4] and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

Section 1112(b)(4) lists sixteen items that constitute "cause." [2] "These examples are not exhaustive, however, and it has been established since the adoption of § 1112 that Congress used the word 'includes' purposefully and that the grounds listed in the statute are non-exclusive." [3] *In re Ameribuild Constr. Mgmt.*, 399 B.R. 129, 131 (Bankr. S.D.N.Y. 2009); *see also C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1311 (2d Cir. 1997); *In re TCR of Denver, LLC*, 338 B.R. 494, 500 (Bankr. D. Colo. 2006) ("It is clear that Congress amended section 1112(b) to make it broader,

more strict as to debtors, and more encompassing. For example, the legislative history for section 1112(b) reflects that versions of this section leading to the enactment are entitled 'Expanded Grounds for Dismissal or Conversion and Appointment of the Trustee.'"). Here, the Bank moves to dismiss the case for cause on the grounds of "subjective bad faith on the part [*5] of the debtor, in that the motive for filing the petition was to abuse the reorganization process, coupled with an objective element that reorganization is in fact unrealistic." *In re Gucci*, 174 B.R. 401, 409 (Bankr. S.D.N.Y. 1994). The Bank bears the burden of showing cause to dismiss the case under § 1112(b). *See In re Willows of Coventry Ltd. P'ship*, 154 B.R. 959, 960 (Bankr. N.D. Ind. 1993).

> 2   Section 1112(b)(4) provides
>
> > For purposes of this subsection, the term "cause" includes-- (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; (B) gross mismanagement of the estate; (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public; (D) unauthorized use of cash collateral substantially harmful to 1 or more creditors; (E) failure to comply with an order of the court; (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter; (G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure [*6] without good cause shown by the debtor; (H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any); (I) failure timely to pay taxes owed after the date of the order for relief

or to file tax returns due after the date of the order for relief; (J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court; (K) failure to pay any fees or charges required under chapter 123 of title 28; (L) revocation of an order of confirmation under section 1144; (M) inability to effectuate substantial consummation of a confirmed plan; (N) material default by the debtor with respect to a confirmed plan; (O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and (P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

3 Under § 102(3), the Code's Rules of Construction provides that the term "includes" is not limiting.

Bad faith is not a factor listed under § 1112(b)(4), nor does the Code provide a definition of either [*7] bad faith or good faith. *See In re 68 W. 127 St., LLC*, 285 B.R. 838, 843 (Bankr. S.D.N.Y. 2002). However, courts have uniformly held that an implicit prerequisite to filing a bankruptcy petition is "good faith on the part of the debtor, the absence of which may constitute cause for dismissal." *See Carolin Corp. v. Miller*, 886 F.2d 693, 698 (4th Cir. 1989) (citing *In re Winshall Settlor's Tr.*, 758 F.2d 1136, 1137 (6th Cir. 1985); 2 L. King, Collier on Bankruptcy P 301.05[1], at 301-6 to 301-7 & n. 2a (15th ed. 1979)). This "implicit" good faith requirement is required to prevent fraud or abuse of the bankruptcy process. *See In re Shar*, 253 B.R. 621, 629 (Bankr. D.N.J. 1999) (internal citations omitted). "Section 1112(b) and its associated 'good faith' doctrine are primarily concerned with the underlying question whether reorganization is the proper course of action in a particular debtor's case. On that score, dismissal of a chapter 11 petition--like dismissal of any lawsuit--is not imposed principally as a sanction for bad intentions or obstreperous behavior. Instead, dismissal flows from the legal determination the debtor is not entitled to the remedy it seeks." *Gucci*, 174 B.R. at 410 [*8] (citing *In re Foundry of Barrington P'ship*, 129 B.R. 550, 554 (Bankr. N.D. Ill. 1991)).

A. Bad Faith

In the Second Circuit, courts look to the following factors to determine whether a debtor has acted in bad faith

(1) the debtor has only one asset; (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors; (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt; (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action; (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (6) the debtor has little or no cash flow; (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and (8) the debtor has no employees.

*In re C-TC 9th Ave. P'ship*, 113 F.3d at 1311. These factors are not to be applied mechanically and the existence of bad faith does not depend on any particular combination of factors, but rather must [*9] be gauged from the facts and circumstances of each case. *See In re Thirtieth Place, Inc.*, 30 B.R. 503, 505 (B.A.P. 9th Cir. 1983) (citing *In re Levinsky*, 23 B.R. 210, 217 (Bankr. E.D.N.Y. 1982)).

In its reply to the motion to dismiss, the Debtor does not raise issue that most, if not all of the *C-TC* factors are satisfied in this case. 4 Instead, the Debtor, citing *68 W. 127 St.*, 285 B.R. at 846, argues that the motion to dismiss should be denied because there is a likelihood that the Debtor could reorganize and a reasonable chance that the Debtor could emerge from bankruptcy. To bolster its argument, the Debtor points to the plan of reorganization it filed on May 8, 2009.

4 Indeed, the Debtor is a single asset real estate

debtor with few unsecured creditors whose claims are *de minimis* when compared to the secured claim of the Bank. Further, the Bank was prepared to file a summary judgment motion in the state court foreclosure action concerning the Property of the Debtor and a receiver was appointed before the Debtor filed its bankruptcy petition. Moreover, the budget submitted by the Debtor in connection with its cash collateral motion does not take into account mortgage payments to the [*10] Bank or U.S. Trustee fees. Accounting for those two sources of expenditures leaves the Debtor with little or no cash flow. Further the Debtor does not dispute that it has no employees or that its petition was filed on the eve of the receiver taking possession of the Property.

In *68 W. 127 St.*, the court stated the "critical test of a debtor's bad faith remains whether on the filing date there was no reasonable likelihood that the debtor intended to reorganize and whether there is no reasonable possibility that the debtor will emerge from bankruptcy." 285 B.R. at 846 (citing *In re Sletteland*, 260 B.R. 657, 662 (Bankr. S.D.N.Y. 2001); *In re Kingston Square*, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997)). The Debtor submits that its filed plan is evidence of its ability to emerge from bankruptcy. The Debtor's plan is a "new value" plan whereby creditors would be paid from (1) a $ 50,000 or $ 100,000 capital infusion from a 50% shareholder of the Debtor; [5] (2) cash flow from operations; and (3) future income. The secured claim of the Bank would be satisfied over a 20 year period, with a balloon payment at the end of the 20 year term. Unsecured creditors would get five cents on the dollar and [*11] equity would retain their ownership interests in the Debtor.

    5    Article I of the plan provides a new value infusion of $ 50,000, but Article VII lists the new value contribution at $ 100,000.

"Courts should not dismiss a [c]hapter 11 case where the debtor has any significant prospect of successfully reorganizing the structure of its real debt. *In re Johns-Manville Corp.*, 36 B.R. 727, 736 (Bankr. S.D.N.Y. 1984) (citing *Banque de Financement v. First Nat'l Bank of Boston*, 568 F.2d 911 (2d Cir. 1977)). However, a debtor must evidence "some feasibility of effectuating a viable reorganization plan. In this regard, it has been stated, 'debtors should not continue . . . under the umbrella of the reorganization court beyond the point

at which reorganization no longer remains a realistic undertaking, unless liquidation would proceed more expeditiously and less expensively under the control of the debtor.'" *In re McDermott*, 78 B.R. 646, 651 (Bankr. N.D.N.Y. 1985) (citing *In re L.S. Good and Co.*, 8 B.R. 315, 318 (Bankr. N.D. W. Va. 1980)). "In addition, it is also clear that once rehabilitation becomes unrealistic, the debtor should not be permitted to remain under [c]hapter 11." *Id.* The Court finds [*12] that the Debtor's proposed plan is unreasonable and not feasible on its face.

First, the Debtor states that it plans to pay creditors through the new value injection of $ 50,000 or $ 100,000, coupled with cash flow from its operations. This statement obfuscates the fact that before the petition date the Debtor absolutely assigned its right, title and interest in all rents to the Bank. The rents from the leases appear to be the only source of current and future cash flow to the Debtor. Section 2.2.(a) of the mortgage entered into between the parties on May 18, 2007, provides

> Borrower hereby absolutely and unconditionally grants, transfers, conveys, sells, sets over and assigns to Lender all of Borrower's right, title and interest now existing and hereafter arising in and to the leases, subleases, concessions, licenses, franchises, occupancy agreements, tenancies, subtenancies and other agreements, either oral or written, now existing and hereafter arising which affect the Property, Borrower's interest therein or any improvements located thereon, together with any and all security deposits, guaranties of the lessees' or tenant's obligations (including any and all security therefor) and [*13] other security under such leases, subleases, concessions, licenses, franchises, occupancy agreements, tenancies, subtenancies and other agreements . . . and hereby gives to and confers upon Lender the right to collect all income, rents, issues, profits, royalties and proceeds from the Leases and any business conducted on the Property and any and all prepaid rent and security deposits thereunder . . . *This Security Instrument is intended by Lender and Borrower to create and shall be construed to create an absolute*

*assignment to Lender of all of Borrower's right, title and interest in and to the Leases and the Rents and shall not be deemed merely to create a security interest therein for the payment of any indebtedness or the performance of any obligations under the Loan Documents . . .*

Section 2.2(a) (emphasis added). Section 2.2(b) defined the Debtor's rights in the rents under the mortgage as a "revocable license to collect."

Nothwithstanding the foregoing assignment of Rents, so long as no Event of Default . . . remains uncured, Borrower shall have a revocable license, to collect all Rents, and to retain the same. Upon any Event of Default, Borrower's license to collect and retain [*14] Rents shall terminate automatically and without the necessity for any notice.

Much of the parties' arguments over the cash collateral motion pending before the Court centered on whether the rents from the Property were property of the estate at the filing of the petition, so as to enable the Debtor to use such rents as cash collateral. The discussion here will center around the whether such rents are property of the estate, such that the Debtor can use them to fund its proposed plan of reorganization.

Under 11 U.S.C. § 541(a)(1), property of the estate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case. The issue here is whether the absolute assignment of rents in the mortgage divested the debtor of all legal and equitable interests in the rents as of the petition date. To determine the debtor's property rights in the rents, the Court must look to state law. *See Butner v. United States*, 440 U.S. 48, 54, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979); *First Fidelity Bank, N.A. v. Jason Realty, L.P. (In re Jason Realty, L.P.)*, 59 F.3d 423, 427 (3d Cir. 1995) ("Assignments of rents are interests in real property and, as such, are created and defined in accordance with [*15] the law of the situs of the real property.").

Much of the parties' dispute in the cash collateral motion centered around whether a receiver needed to be appointed and/or take possession of the Property to transfer title of the rents. New York law is, at best, unclear on the topic of whether an absolute assignment of rent transfers title to the rent upon execution of the instrument. Under New York law, a "mortgage assignment of rent clause that constitutes a pledge of rents as security in case of a default, and not an absolute assignment, creates a security interest." *In re Temple Court Assocs.*, 1996 U.S. Dist. LEXIS 13772, at *9 (S.D.N.Y. Sept. 18, 1996). If the assignment of rent clause created a security interest, a "mortgagee's interest in unpaid rents does not become enforceable until either a receiver is appointed or the mortgagee comes into possession of the property." *Id.* (citations omitted). In addition, under New York law, "an assignment of rents clause in a mortgage is not self-executing and operates merely as a pledge of the rents, to which the pledgee does not become entitled until he asserts his right by taking affirmative steps, such as the appointment of a receiver to [*16] collect the rents for the benefit of the mortgagee, or obtaining an order for the sequestration of the rents." *In re Pine Lake Vill. Apartment Co.*, 17 B.R. 829, 833 (Bankr. S.D.N.Y. 1982) (citing *Sullivan v. Rosson*, 223 N.Y. 217, 119 N.E. 405(1918); *In re Brose*, 254 Fed. 664 (2d Cir. 1918); *In re Hines*, 88 F2d 423 (2d Cir. 1937)).

Here, the language of section 2.2(a) of the mortgage clearly demonstrates than an absolute assignment of rents, and not a security interest, was executed. The Bank's title to the rents was not dependent on any default on the part of the Debtor. Moreover, even if the assignment could be construed as a security interest, the Bank took affirmative actions by appointing the receiver on February 23, 2009, before the petition date. Therefore, whether the assignment of rents is construed as a security interest or not, the Debtor absolutely assigned its interests and title to the rents prepetition to the Bank. Moreover, under New York law, the "appointment of a receiver does not change title to the property." *In re Koula Enters.*, 197 B.R. 753, 758 (Bankr. E.D.N.Y. 1996).

A receiver pendente lite is a person appointed to take charge of the fund or property to which the receivership [*17] extends while the case remains undecided. The title to the property is not changed by the appointment. The receiver acquires no title, but only the right of possession as the officer of the court. The title remains in those in whom it was vested when the appointment was made. The object of the

appointment is to secure the property pending the litigation, so that it may be appropriate in accordance with the rights of the parties, as they may be determined by the judgment in the action.

*Id.* (citing *Greenwich Sav. Bank v. Samotas*, 17 N.Y.S.2d 772, 774 (N.Y. Mun. Ct. 1940)). A receiver only effectuates a change in who has a right to possess the rents, not title. Therefore, as of the petition date, the Bank held title to the rents from the Property.

However, an absolute assignment of rents prepetition does not necessarily mean that the estate has no interest in the rents for the purposes of a § 541 analysis. *In re Grant Assoc.*, 1991 U.S. Dist. LEXIS 1245, at *12 (S.D.N.Y. Feb. 5, 1991) ("The finding that the assignment was absolute does not necessarily compel the conclusion . . . that [the] Debtor retains no interest whatsoever in the rents."); *see also* Hon. John C. Minahan, Jr., *Rents and* [*18] *Profits in Bankruptcy: A Nebraska Primer and Consideration of L.B. 14*, 27 Creighton L. Rev. 158, 164 (1993) ("[T]here is serious contention in both the literature and decisional law that rents and profits are not included in property of the estate where the debtor has made an absolute assignment prior to bankruptcy."). In *In re Constable Plaza*, 125 B.R. 98, 102 (Bankr. S.D.N.Y. 1991), the court stated that even if a lender had received an absolute assignment of rents from a debtor prepetition, the debtor's interest in the property was not completely cut off. Rather the debtor still had an interest in the rents in the form of an accounting for any rents beyond the amount of the mortgage debt. *Id.* Therefore, as of the petition date, the Debtor's only interest in the rents was an accounting. *See Koula Enters.*, 197 B.R. at 759 ("[T]he debtor retains an interest in the rents because if the mortgage is ever satisfied, the right to collect rents will revest in the debtor.").

In light of the fact that the Debtor only has an interest in the rents to the extent the mortgage is ever satisfied, the cash flow from the rents itself until the mortgage is satisfied is not property of the estate and [*19] cannot be used by the Debtor to fund the plan. For that reason, the Court finds that the Debtor's proposed plan is unfeasible because there are no other apparent sources of funding outside of the rents. In *Jason Realty, L.P.*, 59 F.3d at 429, the court decided under New Jersey law, pursuant to a prepetition absolute assignment of rent

agreement, that the validly assigned rents were not property of the estate. Logically, "when rents are not property of the debtor's estate, they may not be used to fund a plan of reorganization." *Id.* at 430 (citing *Commerce Bank v. Mountain View Vill.*, 5 F.3d 34, 37 (3d Cir. 1993)). Without the rents, there is no other source of funding available to the Debtor for the plan and it would be patently unfeasible.

Further, even if the rents were property of the estate, the Debtor has not shown that it would be able to propose a confirmable plan under § 1129. Under §1129(a)(7), [6] otherwise known as the "best interest of creditors" test, "absent consent, a creditor . . . must receive property that has a present value equal to that participant's hypothetical chapter 7 distribution if the debtor were liquidated instead of reorganized on the plan's effective date." [*20] 7 COLLIER ON BANKRUPTCY P 1129.03[7][b] (15th ed. rev. 2008). The Bank has already stated it would not consent to the plan. Further, the Debtor has not provided an explanation of how paying the Bank over 20 years with a balloon payment at the end of the term would provide the Bank with the present value of its claim. The Debtor has also not provided any information on how that balloon payment will be funded. Moreover, the Debtor has been unable to obtain financing and has not produced any prospects of future financing, as the Debtor itself values the Property at $ 2.5 million and the Bank holds a secured debt on the Property in excess of $ 3 million.

> 6  (7)With respect to each impaired class of claims or interests--
>
>   (A) each holder of a claim or interest of such class--
>
>   (i) has accepted the plan; or
>
>   (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date . . . .

Further, the Debtor assumes that there will be an accepting class under the plan. [7] Even under that [*21] scenario, if the plan purports to "cramdown" the Bank's secured claim under § 1129(b)(2)(A)(i), [8] the Bank must retain its lien securing its claim and receive deferred cash payments equal to the value of its claim on the effective

date of the plan. The Debtor's projected cash flow does not support the deferred payments contemplated by the plan. Further, while balloon payments are permissible, they are generally allowed when "the property itself will provide the source for the balloon payment [and t]here is no evidence that the property will decline in value. Therefore, when the balloon is due, either the property will be sold which will provide the balloon or refinancing will be possible." *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.)*, 994 F.2d 1160, 1169 (5th Cir. 1993). As mentioned above, the Bank holds an undersecured claim on the property, which calls into question the reasonableness of the balloon payments and the feasibility of the plan.

7   *See* 11 U.S.C. § 1129(a)(10).

8   With respect to a class of secured claims, the plan provides--

(i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens [*22] is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property . . .

.

Unlike the debtor in *In re 68 W. 127 St., LLC*, the Debtor here has not earned the right to at least make the case for confirmation of its plan. In *68 W. 127 St.*, the lender valued its secured claim at over $ 328,000. 285 B.R. at 841 n.2. Under the terms of the plan proposed by

the debtor in that case, "the [d]ebtor's principals would pay $ 175,000 into the estate and either guarantee a new $ 175,000 first mortgage loan or pay another $ 175,000 into the estate themselves if such loan cannot be obtained." *Id.* Under those terms, the *68 W. 127 St.* court held that the debtor's plan was "not mere speculation." *Id.* Here, the uncertainty of the Debtor's cash flow, combined with the questionable ability of the Debtor to make the indeterminate balloon payment, makes any prospect of [*23] a successful plan speculative at best.

The Court finds that the Debtor has not proposed a feasible or reasonable plan and will not likely be able to successfully emerge from bankruptcy. As such, the Court finds there is cause to dismiss the case under § 1112(b). Further, since the Debtor's case is dismissed, the Court will not address the Bank's motions under § 305(a).

CONCLUSION

The Court finds that the prospects of reorganization for the Debtor are unrealistic. A debtor who has no realistic chance of successfully emerging from bankruptcy should no longer be in chapter 11. As such, the Debtor's chapter 11 case is dismissed.

Accordingly, it is hereby

ORDERED, the Debtor's case is dismissed.

Dated: New York, New York

June 25, 2009

/s/ **Arthur J. Gonzalez**

UNITED STATES BANKRUPTCY JUDGE



**In re: SOHO 25 RETAIL, LLC, Debtor. Soho 25 Retail, LLC, Plaintiff, v. Bank of America, N.A. as trustee for the Registered Holders of GS Mortgage Securities Corporation II, Commercial Mortgage Pass-Through Certificates, Series 2006-GG8, Defendant.**

**Ch. 11, Case No. 10-15114 (SHL), Adv. Pro. No. 11-1286 (SHL)**

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2011 Bankr. LEXIS 1257**

**March 31, 2011, Decided**

**COUNSEL:** [*1] For Debtor/Plaintiff: Nancy L. Kourland, Esq., ROSEN & ASSOCIATES, P.C., New York, New York.

For Movant/Defendant: Eduardo J. Glas, Esq., McCARTER & ENGLISH, LLP, New York, New York.

**JUDGES:** HONORABLE SEAN H. LANE, UNITED STATES BANKRUPTCY JUDGE.

**OPINION BY:** SEAN H. LANE

**OPINION**

### MEMORANDUM DECISION AND ORDER REGARDING THE DEBTOR'S RIGHT TO RENTAL PAYMENTS

**SEAN H. LANE**
**United States Bankruptcy Judge:**

Before this Court is the question of whether rents from certain debtor owned real estate are property of the bankruptcy estate or property of the debtor's mortgage lender by virtue of an assignment of rents executed between the two parties.

On January 3, 2011, Bank of America, N.A., as trustee for the Registered Holders of GS Mortgage Securities Corporation II, Commercial Mortgage Pass-Through Certificates Series 2006-GG8 (the "Lender"), filed a motion requesting relief from the automatic stay pursuant to Section 362(d) of the Bankruptcy Code. [1] In that motion, the Lender sought to continue foreclosure proceedings against 25 West Houston Street in New York City ("25 Houston" or the "Property"), which is owned by debtor 25 Soho Retail, LLC (the "Debtor"). Some three weeks after the motion was filed, the Debtor filed a complaint [*2] against the Lender asserting, among other claims, that the rents from 25 Houston are property of Debtor's bankruptcy estate and have been improperly collected by the Lender. [2] Three days after filing its Complaint, the Debtor also filed an objection to the motion. [3]

---

1 The Lender's motion was filed at ECF docket number 21. Unless otherwise indicated, all ECF docket citations herein refer to chapter 11 case number 10-15114 (SHL).

2 The Debtor's Complaint was filed on January 28, 2011 at ECF docket number 30, initiating adversary proceeding number 11-1286 (SHL).

3 The Debtor's objection to the Lender's motion was filed on January 31, 2011 at ECF docket number 31 (the "Objection"). Further responses

and replies were filed by the parties at ECF docket numbers 33, 34, 35, and 36 of chapter 11 case number 10-15114 (SHL) and ECF docket numbers 5 and 6 of adversary proceeding number 11-1286 (SHL).

On February 7, 2011, this Court held a hearing on the Lender's motion. At the hearing, the Court and the parties agreed that the question of whether the rents belong to the bankruptcy estate or to the Lender is a threshold issue for the Lender's motion to lift stay, the Debtor's Complaint, and the Debtor's [*3] ultimate reorganization. [4] Given the state of the record at the hearing, the Court denied the motion without prejudice to permit the parties to supplement their briefing on the rent issue. The parties agreed that their briefing, as supplemented, would constitute cross motions for summary judgment as to the proper ownership of these rents, an issue presented in Count I of the Complaint.

> 4   The Debtor filed a plan of reorganization on December 27, 2010. According to the Complaint, "[c]onfirmation and implementation of the Debtor's Plan [are] premised upon the Debtor's use of the Rents." Complaint ¶ 21.

For the reasons set forth below, this Court concludes that the rents are not property of the Debtor's estate and instead rightfully belong to the Lender. Accordingly, the Court grants summary judgment to the Lender on Count I of the Complaint.

## BACKGROUND[5]

> 5   There do not appear to be any material facts in dispute. The facts are based upon the Complaint and the Declaration of Alex J. Guggenheim in Support of Motion of Bank of America, as Trustee, for Entry of an Order Pursuant to Section 362(d) of the Bankruptcy Code Granting Relief from the Automatic Stay dated December 26, 2010 as filed by the [*4] Lender at ECF docket number 24 ("Guggenheim Declaration"). The facts in the Complaint are further supported by the Debtor's Local Rule 1007-2 Declaration filed on September 28, 2010 at ECF docket number 1.

The Debtor owns certain condominium units at 25 Houston, which serves as ground floor retail space that the Debtor leases to three commercial tenants. Complaint ¶¶ 6-7.

Pursuant to a loan agreement dated July 31, 2006 between the Debtor and Greenwich Capital Financial Products, Inc. ("Greenwich"), the Debtor borrowed $8,500,000 from Greenwich as evidenced by an Amended and Restated Promissory Note (the "Note"). Id. ¶ 8. To secure repayment of the Note, the Debtor executed (1) a Mortgage and Mortgage Consolidation dated July 31, 2006 in favor of Greenwich (collectively, the "Mortgage"), and (2) an Assignment of Leases and Rents dated July 31, 2006 (the "Assignment"). Id. ¶ 9. The Note, Mortgage, and Assignment (collectively, the "Loan Documents") were assigned from Greenwich to Wells Fargo Bank, N.A., and thereafter, to the Lender. [6] Id. ¶¶ 10-11.

> 6   In connection with the Loan Documents, Wells Fargo Bank, N.A. acted as trustee for the Registered Holders of GS Mortgage Securities Corporation [*5] II, Commercial Mortgage Pass-Through Certificates, Series 2006-GG8, which is the same trustor as that of the Lender. See Complaint at 1-3 and Guggenheim Declaration ¶ 9, Exhibit H. On March 22, 2011, the Lender notified the Court that Bank of America, N.A. resigned as trustee and a new trustee, U.S. Bank, N.A., has been appointed and the Loan Documents are in the process of being transferred to the new trustee. See ECF docket number 41. Throughout all relevant times, the trustor has remained the same.

## A. Assignment of Rents

The Assignment grants the Lender expansive rights regarding rental payments derived from the Property. [7] For example, the Assignment provides:

> [The Debtor] hereby authorizes [the Lender] or its agents to collect the Rents; provided, however, that prior to an Event of Default, and subject at all times to the requirement that payments and deposits of Rents be made directly to the Clearing Account, [the Debtor] shall have a revocable license, but limited as provided in this Assignment and in any of the other Loan Documents, to otherwise deal with, and enjoy the rights of the lessor under, the Leases."

Complaint Ex. C, Assignment ¶ 2(a) (emphasis added). The Assignment [*6] further explains that, even prior to any default, the Lender's rights regarding the rents are broader than a mere security interest:

> As part of the consideration for the Debt, [the Debtor] does hereby absolutely and unconditionally assign to [the Lender] all right, title and interest of [the Debtor] in and to all present and future Leases and Rents, and this Assignment constitutes a present and absolute assignment and is intended to be unconditional and not as an assignment for additional security only. It is further intended that it not be necessary for [the Lender] to institute legal proceedings, absent any requirements of law or regulation to the contrary, to enforce the provisions hereof.

Id. (emphasis added).

7    The Assignment also contains multiple recitals, including: "WHEREAS, this Assignment is being given as additional security for the Loan . . .." Complaint Ex. C, Assignment at 1.

Of particular relevance here, the Assignment provides additional rights to the Lender regarding the rents in the event of a default:

> [U]pon the occurrence and during the continuation of an Event of Default, [the Debtor] does hereby irrevocably appoint [the Lender] as its attorney-in-fact with full power, [*7] in the name and stead of [the Debtor] to demand, collect, receive and give complete acquittance for any and all of the Rents now due or that may hereafter become due . . . .

Id. ¶ 7 (emphasis added). Notably, the Assignment makes clear that the Lender's rights regarding the rents are not contingent upon the Lender taking control of the property or even initiating action to take such control:

> [Upon the occurrence and during the continuation of an Event of Default, and without the necessity of [the Lender] entering upon and taking and maintaining full control of the Property in person, by agent or by court-appointed receiver, the

license referred to in paragraph (a) above shall immediately be revoked and [the Lender] shall have the right at its option, to exercise all rights and remedies contained in the Loan Documents, or otherwise available at law or in equity."

\* \* \* \*

> [The Lender] may, at its option, without waiving such Event of Default and without regard to the adequacy of the security for the Debt . . . without bringing any action or proceeding, or by a receiver appointed by a court, without taking possession of the Property in its own name, demand, sue for or otherwise collect and [*8] receive all Rents, including those past-due and unpaid, for application to the payment of the Debt in accordance with the terms of the Loan Documents . . . .

Id. ¶¶ 2(b), 5(a) (emphasis added).

## B. Debtor's Defaults

In 2009, the Debtor defaulted under the Loan Documents by failing to make timely payments under the Note. Complaint ¶ 12; Objection ¶¶ 2, 15; Guggenheim Declaration ¶ 13. In a letter dated June 18, 2009, the Lender sent the Debtor a notice of default setting forth the remedies to be exercised by the Lender. Guggenheim Declaration ¶ 20, Exhibit P. The notice of default advised the Debtor that, "by virtue of the Defaults, the [Debtor's] license to collect rents from the [Property] is terminated and the Lender is entitled to all present and past due rents." Id. The notice of default continued:

> Demand is hereby made on the [Debtor] to retain the rents, received by or on behalf of the [Debtor] on or after the date of default, for the benefit of the Lender. Failure to retain the rents for the benefit of the Lender constitutes conversion. The Lender is entitled to the funds in the Reserve Accounts, as such term is defined in the Loan Documents.

Id.

In letters dated November 16, 2009, [*9] March 9,

2010, and September 14, 2010, the Lender instructed tenants of the Property to pay rent directly to the Lender. Guggenheim Declaration ¶¶ 22-23, Exhibits Q-R. In a joint letter dated November 3, 2010, the Debtor and the Lender together instructed one of the Property tenants to pay rent directly to the Lender. Guggenheim Declaration ¶ 24, Exhibit S.

## C. Legal Proceedings

Given the Debtor's failure to satisfy its obligations under the Note, the Lender filed a foreclosure action against the Debtor in the Supreme Court of New York on November 13, 2009. Complaint ¶ 12. The foreclosure action included a demand for the appointment of a rent receiver. Guggenheim Declaration ¶ 14, Exhibit K. The Debtor did not answer or otherwise appear in the foreclosure action. [8] Complaint ¶ 13; Objection ¶ 16.

> [8] By the Debtor's own admission, the Debtor failed to appear in the foreclosure action because "the Debtor had no good faith defense" to the action. Objection ¶ 16.

On May 19, 2010, the Supreme Court of New York entered a default judgment against all defendants in the foreclosure action. Complaint ¶ 13. Pursuant to the order entering default, a referee was appointed to "ascertain and compute . . [*10] . the amount due to the [Lender] under the Loan Documents . . . and to examine and report . . . whether the mortgaged premises can be sold in one parcel." [9] Guggenheim Declaration ¶ 15, Exhibit L.

> [9] The referee was appointed pursuant to 22 N.Y.C.R.R. 36, which governs the appointment of receivers and referees among other state court appointees. Notably, the order granted the Lender's application "in all respects." Guggenheim Declaration ¶ 15, Exhibit L.

The referee issued its report dated July 12, 2010, finding that the Debtor owed the Lender $11,919,133.77 for principal, interest, and other fees under the Loan Documents. [10] Guggenheim Declaration ¶ 16, Exhibit M. Pursuant to a judgment of foreclosure and sale dated August 11, 2010, the referee was directed to sell the Property in one parcel. The August 2010 judgment also provided that the Debtor, after the filing of a "Notice of Pendency," be "hereby forever barred and foreclosed of all right, claim, lien, title, interest and equity of redemption in the [Property] and each and every part

thereof . . . ." Guggenheim Declaration ¶ 17, Exhibit N.

> [10] The Lender appears to be undersecured because it is owed more than the Property is worth. [*11] The Debtor's balance sheet as of December 31, 2009 reflects a book value, net of depreciation, of $2,774,753. Schedule A filed on October 19, 2010 at ECF docket number 9; see also Exhibit C to the Debtor's petition filed on September 28, 2010 at ECF docket number 1. According to an appraisal dated December 20, 2010, the Property is worth approximately $7,300,000. ECF docket number 23, Exhibit E; see Claims Register, Claim No. 4 (Lender's claim for "not less" than $12,192,058.46).

A public auction to sell the Property was scheduled for September 29, 2010. Complaint ¶ 13. Before the auction could proceed, however, the Debtor commenced this bankruptcy case under chapter 11 of title 11 of the United States Code on September 28, 2010. Id ¶ 3; Objection ¶ 17. The bankruptcy petition describes the Debtor's business as a "single asset real estate" case as defined in Section 101(51B) of the Bankruptcy Code. ECF docket number 1. The Debtor is a New York limited liability corporation. Complaint ¶ 6.

## DISCUSSION

### A. Subject Matter Jurisdiction

This Court's subject matter jurisdiction is defined in 28 U.S.C. §§ 157 and 1334. Breeden v. Erie Islands Resort & Marina, Inc. (In re Bennett Funding Grp., Inc.), 2003 WL 174328, 2003 Bankr. LEXIS 41, at *10-11 (Bankr. N.D.N.Y. Jan. 2, 2003) (citing Plaza at Latham v. Citicorp, N.A. 150 B.R. 507, 510 (N.D.N.Y. 1993)). "Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11 . . . and may enter appropriate orders and judgments . . . ." 28 U.S.C. § 157(b)(1). Core proceedings include, but are not limited to: matters concerning the administration of the estate; orders to turn over property of the estate; motions to terminate, annul, or modify the automatic stay; confirmations of plans; and orders approving the use or lease of property, including the use of cash collateral. 28 U.S.C. § 157(b)(2)(A)(E)(G)(L)(M). The instant dispute is a core proceeding because it is fundamental to the administration of the Debtor's estate, the nature and extent of the Debtor's property interests, and the Debtor's

ability to effectuate a plan of reorganization.

## B. Summary Judgment

Federal Rule of Civil Procedure 56(a), incorporated into bankruptcy practice by Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment shall be rendered if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Cordius Trust v. Kummerfeld (In re Kummerfeld), 2011 WL 108339, 2011 Bankr. LEXIS 84, at *26-27 (Bankr. S.D.N.Y. Jan. 13, 2011) [*13] (quoting Fed. R. Civ. P. 56(a)). In evaluating whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." Gladstone Bus. Loan, LLC v. Randa Corp., 2010 WL 4983263, 2010 U.S. Dist. LEXIS 130101, at *7 (S.D.N.Y. Dec. 8, 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Where no triable issue of material fact exists, summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules. Cordius Trust v. Kummerfeld, 2011 Bankr. LEXIS 84, at *29 (Bankr. S.D.N.Y. Jan. 13, 2011) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

## C. New York Law Controls

While the federal Bankruptcy Code determines what may constitute property of the estate, "state law determines the nature of the debtor's interest in a given item." Sapir v. Hudson Realty Co. (In re Rosalind Gardens Assocs.), 157 B.R. 75, 80 (Bankr. S.D.N.Y. 1993) (citing In re Koreag Controle Et Revision S.A., 961 F.2d 341, 349 (2d Cir.), cert. denied, 506 U.S. 865, 113 S. Ct. 188, 121 L. Ed. 2d 132, (1992)); In re Country Squire Assocs. of Carle Place, L.P., 1998 Bankr. LEXIS 1909, at *20 (Bankr. N.D.N.Y. Sept. 30, 1998) [*14] (citing Butner v. United States, 440 U.S. 48, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979)) ("The Supreme Court has decided that, like the determination of property ownership in a bankruptcy context, the issue of whether a security interest in estate property extends to rents derived from the property is one that must be resolved by reference to state law.").

Similarly, a security interest in rents is defined by reference to the law of the state in which the real property is located. In re Carmania Corp. N.V., 154 B.R. 160, 163

(S.D.N.Y. 1993) ("Carmania") (citing Butner v. United States, 440 U.S. 48, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979)). In this case, the Property is situated in New York, and the Loan Documents state that they shall be governed by and construed in accordance with the laws of New York. Not surprisingly then, the parties agree that New York law applies to the instant dispute.

## D. Absolute Assignments

The parties vigorously dispute the legal effect of the Assignment. The Debtor contends that, under New York law, an assignment of rents is not self-executing and does not become effective until a lender affirmatively asserts its rights to those rents. The Debtor further argues that such affirmative steps were not taken here by the Lender. On [*15] the other hand, the Lender contends that the Assignment is absolute and self-executing and, therefore, the Lender was not required to take any affirmative steps to enforce its rights to the rents. Alternatively, the Lender argues that the affirmative steps it took here, including the appointment of a referee, were sufficient to grant the Lender the right to the rents.

The threshold question is whether the Assignment is absolute and thus effective regardless of whether the lender took any affirmative steps to protect its interest. The language of the Assignment supports the idea that the parties here intended an absolute assignment. The Assignment states that the Lender and the Debtor intend the Assignment to "be unconditional and not as an assignment for additional security only," creating "a present and absolute assignment" that would not require legal proceedings to enforce. Complaint Ex. C, Assignment ¶ 2(a). The Assignment clarifies that, before a default, the Debtor has only a revocable license in rent, and upon default, that license is revoked and full rights to the rent are returned to the Lender. Id. By its terms, therefore, the Assignment provided the Debtor with nothing more [*16] than a revocable license in rent, a license that was revoked after the Debtor defaulted under the Loan Documents. [11] Moreover, the Assignment explains that, upon a default by the Debtor, enforcement of the Assignment does not depend upon affirmative acts such as possession or the appointment of a receiver. Complaint Ex. C, Assignment ¶ 2(b) ("Upon the occurrence and during the continuance of an Event of Default, and without the necessity of [the Lender] entering upon and taking and maintaining full control of the Property in person, by agent or by court-appointed

receiver, the license referred to in paragraph (a) above shall immediately be revoked and [the Lender] shall have the right at its option, to exercise all rights and remedies contained in the Loan Documents, or otherwise available at law or in equity.").

    11  As noted above, the parties do not dispute that the Debtor defaulted under the Loan Documents, perhaps as early as June of 2009. See Complaint ¶ 12; Objection ¶¶ 2, 15; Guggenheim Declaration ¶ 13.

The Debtor argues that other provisions of the Assignment lead "to the inescapable conclusion that it was intended only as security for the Mortgage despite the inclusion of language [*17] that states it is unconditional and absolute." Objection ¶ 27. The Debtor relies on a recital, which explains that the Assignment "is being given as additional security." However, "[a]n expression of intent in a 'whereas' clause of an agreement between two parties may be useful as an aid in construing the rights and obligations created by the agreement, but it cannot create any right beyond those arising from the operative terms of the document." Credit Lyonnais v. Getty Square Assocs., 876 F. Supp. 517, 521 (S.D.N.Y. 1995) ("Credit Lyonnais") (quoting Genovese Drug Stores v. Connecticut Packing Co., 732 F.2d 286, 291 (2d Cir. 1984)). In any event, nothing in the language of the recital contradicts the other terms in the Assignment that set forth its unconditional nature.

The Debtor also relies on language from sections 5, 6, 8, and 11 of the Assignment for the proposition that the Assignment was intended solely as additional security for the loan. Such a reading, however, is strained given the language in the remainder of the agreement and the limited legal significance normally accorded to the ancillary statements cited by the Debtor., 732 F.2d 286, 291 (2d Cir. 1984)). In any event, [*18] nothing in the language of the recital contradicts the other terms in the Assignment that set forth its unconditional nature.

Having reviewed the relevant language, the next question is whether an absolute assignment is recognized by New York law. The Lender points to a number of federal court cases suggesting that an absolute assignment is permissible where, as here, it is supported by the language of the agreement. See, e.g., Credit Lyonnais, 876 F. Supp. at 521 ("[W]here an assignment of rents is a present tense assignment of all rents to be held in trust for the benefit of the mortgage lender, the

mortgage lender is entitled to all rents paid to the mortgagor from the date of the mortgagor's default."); Fed. Home Loan Mortg. Corp. v. Nora Assoc., 1992 WL 125520, 1992 U.S. Dist. LEXIS 7033, at *12 (S.D.N.Y. May 26, 1992) ("(The creditor's] entitlement to rents in the instant action is absolute and independent of any action it takes with respect to appointment of a receiver."); Fed. Home Loan Mortg. Corp. v. Dutch Lane Assoc., 775 F. Supp. 133, 139-40 (S.D.N.Y. 1991) ("Dutch Lane") ("Once the FHLMC notifies Dutch Lane in writing of a breach of the mortgage and states it is exercising [*19] its rent rights, the FHLMC is immediately entitled to all rents without any further action required."); In re Loco Realty Corp., 2009 WL 2883050, 2009 Bankr. LEXIS 1724, at *16 (Bankr. S.D.N.Y. June 25, 2009) ("Loco Realty") ("Here, the language of . . . the mortgage clearly demonstrates than an absolute assignment of rents, and not a security interest, was executed."). But as Chief Judge Gonzalez recently observed, "New York law is, at best, unclear on the topic of whether an absolute assignment of rent transfers title to the rent upon execution of the instrument." Loco Realty. 2009 Bankr. LEXIS 1724, at *15.

Indeed, the majority of New York state cases are of the view that an absolute assignment is not permitted, regardless of the language in the agreement., 2009 Bankr. LEXIS 1724, at *15. See, e.g., Lt Propco, LLC v. Carousel Ctr. Co., L.P., 68 A.D.3d 1695, 1696, 893 N.Y.S.2d 395 (N.Y. App. Div. 4th Dep't 2009) ("Because New York operates under a lien theory as opposed to a title theory with respect to mortgages, the language used in the assignment instrument itself is not determinative of what rights are actually transferred."); Suderov v. Ogle, 149 Misc. 2d 906, 909, 574 N.Y.S.2d 249 (N.Y. App. Term 1991) ("Whenever [*20] property is transferred, no matter in what form or by what conveyance, as security for a debt, the conveyance creates a mortgage and the parties are subject only to the obligations of a mortgagor and mortgagee."); Dream Team Assocs. v. Broadway City, 2003 NY Slip Op 50894U, 2003 WL 21203342, 2003 N.Y. Misc. LEXIS 592, at *6 (N.Y. Civ. Ct. May 7, 2003) ("When a lease is assigned as security for a mortgage, no matter what language is used in the instrument of assignment, no transfer of title to the lease can be effected."); Ganbaum v. Rockwood Realty Corp., 62 Misc. 2d 391, 393, 308 N.Y.S.2d 436 (N.Y. Sup. Ct. 1970) ("[A]n assignment of rents clause in a mortgage is not self-executing, but becomes effective only upon

foreclosure or upon the appointment of a receiver of the rents of the mortgaged property."). See also Mooney v. Byrne, 163 N.Y. 86, 93, 57 N.E. 163 (N.Y. 1900) ("[A] conveyance, whatever its form, if in fact given to secure a debt, is neither an absolute nor a conditional sale, but a mortgage, and that the grantor and grantee have merely the rights and are subject only to the obligations of mortgagor and mortgagee."); Carr v. Carr, 52 N.Y. 251, 260 (N.Y. 1873) ("[W]henever property is transferred, no [*21] matter in what form or by what conveyance, as a security for a debt, the transferred takes merely as a mortgagee, and has no other rights or remedies than the law accords to mortgagees."). But see Harris v. Lesster, 35 A.D. 462, 467, 54 N.Y.S. 864 (N.Y. App. Div. 1898), appeal dismissed, 159 N.Y. 533, 53 N.E. 1126 (1899) (finding an assignment described as "further security" to be "perfectly compatible" with an absolute assignment effectuated prior to the appointment of a receiver); Schlesinger v. Sanford Main Shopping Center, Inc., 37 Misc. 2d 840, 845, 237 N.Y.S.2d 190 (N.Y. Sup. Ct. 1962) ("It has been held that the appointment of a receiver or the actual possession of the premises by the mortgagee are not essential to effectuate a valid assignment of rents, and that such assignment may be accomplished by special agreement.").

Ultimately, the Court does not need to resolve this murky legal question because the Lender here took sufficient affirmative steps to make the Assignment effective under New York law.

**E. Affirmative Steps**

The parties do not dispute that, regardless of whether the Assignment is considered absolute or merely a pledge of additional security, the Lender is entitled to the rent if it took sufficient affirmative [*22] steps toward asserting its interest. See 641 Ave. of the Ams. Ltd. Partnership v. 641 Assocs., 189 B.R. 583, 591 (S.D.N.Y. 1995) ("641 Assoc."). Such affirmative steps can include: requesting the appointment of a receiver to collect the rents, demanding or taking possession, commencing foreclosure proceedings, or seeking an order for the sequestration of rents. See United States v. DiGiulio, No. 95-CV-219S, 1999 U.S. Dist. LEXIS 16606, at *3-4 (W.D.N.Y. 1999) ("DiGiulio"); 641 Assocs., 189 B.R. at 591; Carmania, 154 B.R. at 165; In re Cerrico Realty Corp., 127 B.R. 319, 323 (Bankr. E.D.N.Y. 1991); In re Flower City Nursing Home, Inc., 38 B.R. 642, 645 (Bankr. W.D.N.Y. 1984) ("Flower City Nursing"); In re Pine Lake Village

Apartment Co., 17 B.R. 829, 833 (Bankr. S.D.N.Y. 1982) ("Pine Lake Village"). Notably, the case law lists these examples of affirmative steps in the disjunctive. The underlying idea is to reward "parties who are diligent in protecting their interests by requiring affirmative action by the secured party before an assignment of rents is enforceable." Carmania, 154 B.R. at 165 (citing Vecchiarelli v. Garsal Realty, Inc., 111 Misc. 2d 157, 443 N.Y.S.2d 622, 623 (1980)).

The most common [*23] factual situation in the case law on assignments involves the actual appointment of a receiver, instead of a mere request for a receiver. Consistent with the notion to rewarding the diligent creditor, however, courts have concluded that affirmative steps short of the appointment of a receiver may also suffice. For example, a number of cases analyzing New York law have concluded that the request for the appointment of a receiver is enough to vest the right to rents and profits. See, e.g., DiGiulio, 1999 U.S. Dist. LEXIS 16606, at *3-4; Carmania, 154 B.R. at 165; Flower City Nursing, 38 B.R. at 645. Similarly, the ultimate sale of property is not required and the commencement of foreclosure proceedings is sufficient. 641 Assocs., 189 B.R. at 591; Pine Lake Village, 17 B.R. at 834-35. In a third variation on this theme, possession is not required as long as a formal demand for possession is met with refusal. See Flower City Nursing, 38 B.R. at 645; Gomez v. Bobker, 124 A.D.2d 703, 704, 508 N.Y.S.2d 215 (N.Y. App. Div. 2d Dep't 1986); 1180 Anderson Ave. Realty Corp. v. Mina Equities Corp., 95 A.D.2d 169, 174, 465 N.Y.S.2d 511 (N.Y. App. Div. 1st Dep't 1983).

In the instant matter, the Court concludes that the Lender took [*24] numerous affirmative steps that are sufficient, as a matter of law, to now enforce its right to the rents. The Lender commenced a foreclosure proceeding against the Debtor. Complaint ¶ 12. The foreclosure proceeding included a request for the appointment of a receiver. Guggenheim Declaration, Exhibit K. As the Debtor did not answer or otherwise appear in the Foreclosure Action, the Supreme Court of New York filed an order entering default. Complaint ¶ 13. A rent referee was appointed and a foreclosure sale was scheduled. Id. The Lender's formal written demands of the Debtor and tenants also support this conclusion, as does a joint letter in which the Debtor and the Lender together demanded that a tenant pay rent directly to the Lender. See Guggenheim Declaration, Exhibits P-S.

The ultimate appointment of a referee instead of a receiver is not material to the instant dispute. In New York, the appointment of a receiver in a foreclosure action does not alter title to the property. Loco Realty, 2009 Bankr. LEXIS 1724, at *16; In re Koula Enters., 197 B.R. 753, 758 (Bankr. E.D.N.Y. 1996) ("Koula").

> The receiver acquires no title, but only the right of possession as the officer of the court. [*25] The title remains in those in whom it was vested when the appointment was made. The object of the appointment is to secure the property pending the litigation, so that it may be appropriate in accordance with the rights of the parties, as they may be determined by the judgment in the action.

Koula, 197 B.R. at 758 (quoting Greenwich Sav. Bank v. Samotas, 17 N.Y.S.2d 772, 774 (N.Y. Mun. Ct. 1940)). The referee here, like a receiver, was appointed by a court to take actions in connection with property leading up to an eventual sale and, therefore, that appointment constituted a significant affirmative step by the Lender.

In addition to its prepetition actions, the Lender also took a significant affirmative step to enforce its interests after the Debtor's bankruptcy filing by seeking relief from the automatic stay that had been imposed by the Bankruptcy Code. See 11 U.S.C § 362; 641 Assocs., 189 B.R. at 591; Flower City Nursing, 38 B.R. at 645 ("[W]here a bankruptcy petition is filed staying such affirmative action by a mortgagee to perfect its interest in rent proceeds, a mortgagee's petition to lift the stay to obtain appointment of a foreclosure receiver will perfect the interest . . [*26] . ."); Pine Lake Village, 17 B.R. at 834-35 ("Not only did he commence a state court foreclosure action and an action to reinstate the managing agent in order to collect rents, but he also sought relief from the automatic stay in order to continue the state court foreclosure action.").

### F. Property of the Estate

Section 541 of the Bankruptcy Code defines the bankruptcy estate as including "all legal or equitable interests of the debtor in property as of the commencement of the case" wherever they are located and by whomever they are held. 11 U.S.C. § 541(a)(1).

Such interests are defined by reference to state law. Koula, 197 B.R. at 757 (citing Butner v. United States, 440 U.S. 48, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979); In re Prudential Lines, Inc. 928 F.2d 565 (2d Cir. 1991)).

An absolute assignment of rents prepetition does not necessarily mean that the estate has no interest in the rents for the purposes of Section 541 analysis. Loco Realty, 2009 Bankr. LEXIS 1724, at *17 (citations omitted). However, if a debtor has only an interest in the rents to the extent a mortgage is ever satisfied, the cash flow from the rents is not property of the estate until the mortgage is satisfied. Loco Realty, 2009 Bankr. LEXIS 1724, at *18-19. [*27] Therefore, until the Mortgage and Note here are satisfied, the rents are not property of the Debtor's estate and cannot be used by the Debtor to fund a plan of reorganization. See id. (citing First Fidelity Bank, N.A. v. Jason Realty, L.P.), 59 F.3d 423, 430 (3d Cir. 1995); Commerce Bank v. Mountain View Vill., 5 F.3d 34, 38 (3d Cir. 1993)).

Applying these principles here, the rents are not property of the estate because the Debtor had, at most, a revocable license in the rents at issue--a license that was revoked by the Lender prior to the Petition Date--and because the Mortgage and the Note remain unsatisfied.

### CONCLUSION

For the reasons set forth above, the Court finds that the rents are not property of the estate. Accordingly, summary judgment is granted to the Lender on Count I of the Complaint. As the Court understands that resolution of this issue will impact the remainder of the Debtor's Complaint and the Debtor's ultimate reorganization efforts, the Debtor shall promptly advise the Court regarding how it wishes to proceed in this case and how the Court's ruling today impacts any pending matters before the Court.

March 31, 2011
New York, New York

/s/ *Sean H. Lane*

**HONORABLE SEAN H. LANE**

**UNITED** [*28] **STATES BANKRUPTCY JUDGE**